

**ACTUARIAL STANDARDS BOARD**

**Actuarial Standard
of Practice
No. 49**

**Medicaid Managed Care Capitation
Rate Development and Certification**

**Developed by the
Medicaid Rate Setting and Certification Task Force of the
Health Committee of the
Actuarial Standards Board**

**Adopted by the
Actuarial Standards Board
March 2015**

**Doc. No. 179**

Ex. 5 - Wilson Decl.
Page 1 of 33

## ASOP No. 49—March 2015

## T A B L E O FC O N T E N T S

Transmittal Memorandum                                                                        iv

Section 1.  Purpose, Scope, Cross References, and Effective Date                               1
    1.1    Purpose                                      1
    1.2    Scope                                        1
    1.3    Cross References                             1
    1.4    Effective Date                               1

Section 2.  Definitions                                                                       1
    2.1    Actuarially Sound/Actuarial Soundness        2
    2.2    Base Data                                    2
    2.3    Capitation Rate                              2
    2.4    Disproportionate Share Hospital (DSH) Payments  2
    2.5    Encounter Data                               2
    2.6    Enhanced or Additional Benefits              2
    2.7    Federally Qualified Health Centers (FQHC)    2
    2.8    Intergovernmental TransferTransferTransfer(IGT)  3
    2.9    Managed Care Organization (MCO)              3
    2.10   Medical Education Payments                   3
    2.11   Minimum Medical Loss Ratio                   3
    2.12   Performance Incentive                        3
    2.13   Performance Withhold                         3
    2.14   Rating Period                                3
    2.15   Risk Adjustment                             3
    2.16   Rural Health Clinic (RHC)                   3
    2.17   State Plan Services                          3

Section 3.  Analysis of Issues and Recommended Practices                                      3
    3.1    Overview                                     3
    3.2    Medicaid Managed Care Capitation Rate Development Process and Considerations  4
        3.2.1    Form of the Capitation Rates (Single Rate or Capitation Rate Ranges)  4
        3.2.2    Structure of the Medicaid Managed Care Capitation Rates  4
        3.2.3    Rebasing and Updating of Rates  4
        3.2.4    Base Data  5
        3.2.5    Covered Services  5
        3.2.6    Special Payments  6
        3.2.7    Base Data Period Adjustments  6
        3.2.8    Other Base DataAdjustments  6
        3.2.9    Claim Cost Trends  7
        3.2.10  Managed Care Adjustments  7
        3.2.11  Non-Claim Based Medical Expenditures  8
        3.2.12  Non-Medical Expenses  8
        3.2.13  Risk Adjustment  10
        3.2.14  Reinsurance, Risk Corridors, and Other Risk Sharing Arrangements  10

ii

**ASOP No. 49—March 2015**

|  |  | 3.2.15 | Performance Withholds and Incentives | 10 |
|  |  | 3.2.16 | Minimum Medical Loss Ratios | 11 |
|  |  | 3.2.17 | State Initiatives | 11 |
|  |  | 3.2.18 | Inaccurate or Incomplete Information Identified after Opinion or Rate Certification | 11 |
|  | 3.3 |  | Qualified Opinion on Actuarial Soundness | 11 |
|  | 3.4 |  | Documentation | 11 |

Section 4.  Communications and Disclosures      11
    4.1    Communications      11
    4.2    Disclosures      11

**APPENDIXES**

Appendix 1—Background and Current Practices      13

Appendix 2—Comments on the Exposure Draft and Responses      16

iii

**ASOP No. 49—March 2015**

March 2015

**TO:**      Members of Actuarial Organizations Governed by the Standards of Practice of the Actuarial Standards Board and Other Persons Interested in Medicaid Managed Care Capitation Rates and their Certification

**FROM:**    Actuarial Standards Board (ASB)

**SUBJ:**    Actuarial Standard of Practice (ASOP) No. 49

This document contains the final version of ASOP No. 49, *Medicaid Managed Care Capitation Rate Development and Certification.*

Background

This ASOP was developed to establish guidance for actuaries preparing, reviewing, or giving advice on capitation rates for Medicaid programs, including those certified in accordance with 42 CFR 438.6(c). Since the federal regulations took effect, actuaries have used various methods to prepare the capitation rates. This ASOP incorporates the appropriate aspects of these methods to establish guidance and considerations in the rate development process.

Exposure Draft

In December 2013, the ASB approved the exposure draft with a comment deadline of May 15, 2014. Twenty-six comment letters were received and considered in making changes that are reflected in this final ASOP. For a summary of issues contained in these comment letters, please see appendix 2.

The significant changes made to the final standard in response to the comment letters are as follows:

1.      Section 1.2 was edited to clarify situations when this ASOP applies.

2.      Language was added to section 3.1 to require the actuary to have knowledge of and understand the requirements of 42 CFR 438.6(c).

3.      Section 3.2.2 was modified to add a reference to ASOP No. 12, *Risk Classification*, and to clarify that capitation rates may vary by Medicaid eligibility groups.

4.      In section 3.2.12(a)(1) was changed from "should" to "may."

The ASB voted in March 2015 to adopt this standard.

## ASOP No. 49—March 2015

Task Force on Medicaid Rate Setting and Certification

Robert M. Damler, Chairperson

| | |
|---|---|
| Sabrina Gibson | Martin E. Staehlin |
| Michael E. Nordstrom | Kathleen A. Tottle |
| David Ogden | Christopher Truffer |
| Michelle Raleigh | Ross A. Winkelman |
| F. Kevin Russell | |

Health Committee of the ASB

Nancy F. Nelson, Chairperson

| | |
|---|---|
| Robert M. Damler | Darrell Knapp |
| Annette James | Rick Lassow |
| Shannon Keller | Donna Novak |

Actuarial Standards Board

Patricia E. Matson, Chairperson

| | |
|---|---|
| Christopher S. Carlson | Barbara L. Snyder |
| Maryellen J. Coggins | Frank Todisco |
| Beth E. Fitzgerald | Ross A. Winkelman |
| Thomas D. Levy | |

*The Actuarial Standards Board (ASB) sets standards for appropriate actuarial practice in the United States through the development and promulgation of Actuarial Standards of Practice (ASOPs).These ASOPs describe the procedures an actuary should follow when performing actuarial services and identify what the actuary should disclose when communicating the results of those services.*

v

**ASOP No. 49—March 2015**

**ACTUARIAL STANDARD OF PRACTICE NO. 49**

**MEDICAID MANAGEDCARE CAPITATION RATE DEVELOPMENT AND CERTIFICATION**

**STANDARD OF PRACTICE**

Section 1. Purpose, Scope, Cross References, and Effective Date

1.1   Purpose—This actuarial standard of practice (ASOP) provides guidance to actuaries when performing professional services related to Medicaid (Title XIX) and Children's Health Insurance Program (CHIP or Title XXI) managed care **capitation rates**, including a certification on behalf of a state to meet the requirements of 42 CFR 438.6(c).

1.2   Scope—This standard applies to actuaries performing professional services related to Medicaid managed care **capitation rates** including, but not limited to, the following:

   a.   certification on behalf of a state to meet the requirements of 42 CFR 438.6(c);

   b.   **capitation rate** bid or rate acceptance; and

   c.   department of insurance **capitation rate** filing.

This standard also applies to actuaries performing professional services related to managed care **capitation rates** for CHIP. Throughout this standard the term "Medicaid" also refers to CHIP.

If the actuary departs from the guidance set forth in this standard in order to comply with applicable law (statutes, regulations, and other legally binding authority) or for any other reason the actuary deems appropriate, the actuary should refer to section 4.

1.3   Cross References—When this standard refers to the provisions of other documents, the reference includes the referenced documents as they may be amended or restated in the future, and any successor to them, by whatever name called. If any amended or restated document differs materially from the originally referenced document, the actuary should consider the guidance in this standard to the extent it is applicable and appropriate.

1.4   Effective Date—This standard is effective for actuarial communications issued on or after August 1, 2015.

Section 2. Definitions

The terms below are defined for use in this actuarial standard of practice.

1

## ASOP No. 49—March 2015

2.1     Actuarially Sound/Actuarial Soundness—Medicaid **capitation rates** are "**actuarially sound**" if, for business for which the certification is being prepared and for the period covered by the certification, projected **capitation rates** and other revenue sources provide for all reasonable, appropriate, and attainable costs. For purposes of this definition, other revenue sources include, but are not limited to, expected reinsurance and governmental stop-loss cash flows, governmental **risk adjustment** cash flows, and investment income. For purposes of this definition, costs include, but are not limited to, expected health benefits, health benefit settlement expenses, administrative expenses, the cost of capital, and government-mandated assessments, fees, and taxes.

2.2     Base Data—The historical data set used by the actuary to develop the **capitation rates**. The data may be from Medicaid fee-for-service data, **MCO** data, or from a comparable population data source.

2.3     Capitation Rate—A monthly fee paid for each member assigned or each event (for example, maternity delivery) regardless of the number or actual cost of services provided under a system of reimbursement for **MCOs**. **Capitation rates** can vary by member based on demographics, location, covered services, or other characteristics. **Capitation rates** can be structured so that an **MCOs** is fully at risk, or so that an **MCO** shares the risk with other parties.

2.4     Disproportionate Share Hospital (DSH) Payments—Additional amounts paid to hospitals that serve a disproportionally large number of Medicaid or uninsured patients. These payments may be subject to a hospital-specific limit. An annual allotment to each state limits federal financial participation in these payments. These payments are subject to requirements set forth in Section 1923(i) of the Social Security Act.

2.5     Encounter Data—Information about an interaction between a provider of health care services and a member that is documented through the submission of a claim to an **MCO**, and shared between the **MCO** and the state Medicaid agency.

2.6     Enhanced or Additional Benefits—Benefits offered by **MCOs** to their Medicaid members that are above and beyond the benefits offered by the state Medicaid plan. Common examples are adult dental services, non-emergency transportation, and adult vision services.

2.7     Federally Qualified Health Center (FQHC)—An organization that (1) receives grants under Section 330 of the Public Health Service Act; (2) does not receive a grant under the Section 330 of the Public Health Service Act, but otherwise meets all requirements to receive such a grant; or (3) is an outpatient health clinic associated with tribal or Urban Indian Health Organizations (UIHO). The organization must have also applied for recognition, and been approved as a federally qualified health center for Medicare and Medicaid, as described in Sections 1861(aa)(3) and 1905(l)(2) of the Social Security Act. Payments to these organizations are subject to requirements set forth in Section 1902(bb) of the Social Security Act.

2

**ASOP No. 49—March 2015**

2.8 Intergovernmental Transfer (IGT)—A transfer of public funds between governmental entities (for example, county government to state government or state university hospital to state Medicaid agency).

2.9 Managed Care Organization (MCO)—The entity contracting with the state Medicaid agency to provide health care services for selected subsets of the Medicaid population.

2.10 Medical Education Payments—Payments for graduate medical education as part of the rate structure for inpatient hospital payments or as supplemental payments under 42 CFR 447.272. These payments may include direct graduate medical education (GME) or indirect medical education (IME) costs. These payments may be included as part of Medicaid managed care **capitation rates** or may be made directly to providers for managed care enrollees.

2.11 Minimum Medical Loss Ratio—A provision that requires the **MCO** to use no less than a stated portion of its earned premium for defined medical or care management expenditures.

2.12 Performance Incentive—A payment mechanism under which an **MCO** may receive funds in addition to the **capitation rates** for meeting targets specified in the contract between the state and the **MCO**.

2.13 Performance Withhold—An amount included in the **capitation rates** that is paid if the **MCO** meets certain state requirements that may be related to quality or operational metrics. The amount may be withheld or paid up front with the monthly **capitation rate**.

2.14 Rating Period—The time period for which managed care Medicaid **capitation rates** are being developed.

2.15 Risk Adjustment—The process by which relative risk factors are assigned to individuals or groups based on expected resource use and by which those factors are taken into consideration and applied.

2.16 Rural Health Clinic (RHC)—A clinic that meets certain requirements for providing primary care services in specific areas, as outlined in the Public Health Service Act and defined in Section 1905(l)(1) of the Social Security Act. Medicaid payment rates to RHCs may be specified in applicable law.

2.17 State Plan Services—The benefits provided to Medicaid beneficiaries who are eligible under a qualifying category of Medicaid assistance in a state.

Section 3. Analysis of Issues and Recommended Practices

3.1 Overview—An actuary may be developing, certifying, or reviewing Medicaid Managed Care **capitation rates** on behalf of a state Medicaid agency or an **MCO**. When certifying

**ASOP No. 49—March 2015**

whether **capitation rates** meet the requirements of 42 CFR 438.6(c) or reviewing such a certification, the actuary must-have knowledge and understanding of those requirements.

Title 42 CFR 438.6(c) requires that **capitation rates** paid by the state to the **MCOs** be certified as **actuarially sound**. The soundness opinion applies to all contracted **capitation rates**. However, the actuary is not certifying that the underlying assumptions supporting the certification are appropriate for an individual **MCO**.

An actuary providing actuarial services for a contracting **MCO** may be required to develop and submit **capitation rates** to the state Medicaid agency for a **rating period**. While the federal regulation 42 CFR 438.6(c) does not extend to an **MCO** actuary, the **MCO** actuary may be required under the terms of a proposal or contract to submit an actuarial opinionfor the **capitation rates** that may or may not indicate compliance with 42 CFR 438.6(c).

3.2    Medicaid Managed Care Capitation Rate Development Process and Considerations—The actuary should address the following when developing **capitation rates**.

    3.2.1    Form of the Capitation Rates (Single Rate or Capitation Rate Ranges)—The **capitation rate** certification may apply to a single point estimate **capitation rate** or a range of **capitation rates**. If a range of **capitation rates** is prepared, the contracted rates with an **MCO** may be at either end of the range or a point within the range. The **capitation rates** may vary by **MCO**.

    3.2.2    Structure of the Medicaid Managed Care Capitation Rates—**Capitation rates** are usually separately developed and paid in individual **capitation rate** cells based on characteristics that cause costs to differ materially. Examples of these characteristics include age, gender, qualifying event (for example, maternity delivery), geographic region, Medicaid eligibility group, eligibility for Medicare benefits, diagnosis or **risk adjustment** factors, and **MCO** differences. In determining the rating structure, the actuary should consider how well the structure aligns capitation revenue and **MCO** risk as well as the complexity of the rating structure. A certification of the **capitation rates** under 42 CFR 438.6(c) applies to each of the individual **capitation rate** cells. For further guidance, see ASOP No. 12, *Risk Classification*.

    3.2.3    Rebasing and Updating of Rates—When developing **capitation rates** for subsequent **rating periods**, the actuary should either rebase the rates or update existing rates. Rebasing of rates generally refers to using **base data** from a more recent time period to develop **capitation rates** along with updating assumptions used to develop the rates. Updating of rates involves adjusting existing rates to reflect the impacts of any program, benefit, population, trend, or other changes between the **rating period** of the existing rates and the **rating period** of the updated rates.

4

## ASOP No. 49—March 2015

The actuary should consider the following in making the determination whether to rebase rates or update existing rates: availability of updated data, likely materiality of rebasing, changes in the underlying population, quality of data since the last rebasing, and time elapsed since the last rebasing.

3.2.4    Base Data—The actuary should use **base data** (for example, population, benefits, provider market dynamics, geography) that is appropriate for the program for which **capitation rates** are being developed. The **base data** may span more than one year.

The actuary should use **base data** sources for utilization or unit cost that are relevant to the given Medicaid population and appropriate for the given use. Program-specific historical experience from the following sources are examples of **MCO** data that may meet these criteria:

a.    financial reports;

b.    summary **encounter data** reports;

c.    **encounter data** with payment information;

d.    **encounter data** without payment information;

e.    sub-capitation payment information; and

f.    provider settlement payment reports.

If the managed care program is new or if previously carved-out services are to be included in the rates, the actuary may need to use alternative data sources. Such alternative data sources typically include fee-for-service experience and experience from other states, although other sources may be appropriate. That experience may be available in several forms, including the following:

1.    financial reports;

2.    summary claims data reports;

3.    raw claims data with payment information; and

4.    state-specific provider settlement payment reports.

If the covered population is new, the actuary should identify data sources for similar populations and make appropriate adjustments.

3.2.5    Covered Services—When developing capitation rates under 42 CFR 438.6(c), the actuary should reflect covered services for Medicaid beneficiaries, as defined in

5

**ASOP No. 49—March 2015**

the contract between the state and the **MCOs**, which may include cost effective services provided in lieu of **state plan services**.

When developing capitation rates for other purposes, the actuary should reflect the cost of all services, including **enhanced or additional benefits**, provided to Medicaid beneficiaries.

3.2.6    Special Payments—Payments in addition to the Medicaid fees may be made by states directly or through the MCOs to providers of Medicaid services. These payments are usually made to hospitals, but other provider types may also qualify for such payments. These payments are sometimes reciprocation for the provider paying a special tax or assessment fee.

The actuary should identify any special payments to providers (for example, supplemental payments or bonuses) and include these payments in development of the **capitation rates** in a manner that reflects the payment policy for these special payments in the **rating period**.

3.2.7    Base Data Period Adjustments—The actuary should consider **base data** period adjustments of the following three types:

a.    Retroactive Period Adjustments—The retroactive period adjustments reflect changes that occurred during the **base data** period to standardize the data over the **base data** period.

b.    Interim Period Adjustments—The interim period adjustments reflect changes that occurred between the **base data** period and the **rating period**.

c.    Prospective Period Adjustments—The prospective period adjustments reflect changes that will occur in the **rating period**.

3.2.8    Other Base Data Adjustments—The actuary should consider other **base data** adjustments, which may include the following:

a.    Missing Data Adjustment—Circumstances that may cause data to be missing include, but are not limited to, the following:

1.    certain claims are not processed through the same system as the **base data**;

2.    Medicaid fee-for-service data may not include all services or expenses to be covered by the **capitation rate**; or

3.    Medicaid **encounter data** may not reflect services that are sub-capitated and not reported through the **encounter data** system.

6

ASOP No. 49—March 2015

b.     Incomplete Data Adjustment—The incomplete data adjustment reflects claims that were in course of settlement, claims that were incurred but not reported, or amounts that are due for reinsurance or claim settlements.

c.     Population Adjustment—The population adjustment modifies the **base data** to reflect differences between the population underlying the base period and the population expected to be covered during the **rating period**.

d.     Funding or Service Carve-Out Adjustments—The funding or service carve-outs are not the financial responsibility of the **MCO**. Funding carve-outs may include graduate **medical education payments**, **disproportionate share hospital payments**, or provider taxes. Service carve-outs reflect services that will not be covered by the **capitation rate**.

e.     Retroactive Eligibility Adjustments—Medicaid beneficiaries are often provided retroactive eligibility coverage for a period prior to submitting an application for Medicaid coverage. The retroactive eligibility adjustment reflects the exclusion of periods of retroactive eligibility, if any, that are not the responsibility of the **MCO**.

f.     Program, Benefit, or Policy Adjustments—The program, benefit, or policy adjustments reflect differences in benefit or service delivery requirements between the base period and the **rating period** that impact the financial risk assumed by the **MCO**.

g.     Data Smoothing Adjustments—The data smoothing adjustments address anomalies or distortions in the **base data**, such as large claims or limited enrolment.

3.2.9   Claim Cost Trends—The actuary should include appropriate adjustments for trend and may consider a number of elements in establishing trends in utilization, unit costs, or in total. Medicaid utilization trend rates may be particularly affected by changes in demographics and benefit levels, and by policy or program changes. Medicaid unit cost trends may be particularly affected by changes in state-mandated reimbursement schedules (if applicable), Medicaid fee-for-service fee schedules, and provider contracting performed by the **MCOs**. The trend assumption should not include adjustments captured elsewhere in the capitation rate development.

3.2.10   Managed Care Adjustments—The actuary may apply managed care adjustments based on the assumption that the program will move from the level of managed care underlying the **base data** to a different level of managed care during the **rating period**. The adjustments may be to utilization, unit cost, or both, and the impact of the adjustments may be either an increase or a decrease to the **base data**. If managed care adjustments are included, the changes reflected in the

7

## ASOP No. 49—March 2015

adjustments should be attainable in the **rating period**, in the actuary's professional judgment.

The actuary should consider the following when reviewing the need for and developing the managed care adjustments:

a.   state contractual and operational requirements, and relevant laws and regulations;

b.   current characteristics of the provider markets; and

c.   the maturity level of the managed Medicaid program.

3.2.11   Non-Claim Based Medical Expenditures—The actuary should consider Medicaid-specific payments that are not included in the **base data** or that are included in the **base data** but for which the historical costs do not represent future costs. The actuary should determine whether these amounts will be an expense to the **MCOs**, and if so, how the amounts should be reflected. These types of payments include, but are not limited to, the following:

a.   **disproportionate share hospital payments**;

b.   **federally qualified health centers** or **rural health clinics** supplemental settlement payments;

c.   **medical education payments**;

d.   **intergovernmental transfers**; and

e.   pharmacy rebates anticipated to be collected by the **MCO**.

3.2.12   Non-Medical Expenses—The actuary should include amounts for appropriate non-medical expenses in the development of the **capitation rates**. The non-medical expenses may vary by **MCO**.

a.   Administration—The actuary should include a provision for administrative expenses appropriate for the Medicaid managed care business in the state.

1.   Determination of Administrative Expenses—In determining administrative expenses, the actuary may take into account relevant characteristics and functions of the **MCOs** and the Medicaid program, such as the following:

i.   overall size of the **MCO** across all lines of business;

8

**ASOP No. 49—March 2015**

    ii.    age and length of time participating in Medicaid;

    iii.    organizational structure; and

    iv.    demographic mix of enrollees.

2.    <u>Types of Administrative Expenses</u>—Appropriate types of administrative expenses include, but are not limited to, the following:

    i.    marketing;

    ii.    claims-processing;

    iii.    medical management costs including those required to achieve savings from fee-for-service or prior periods assumed in the medical cost targets; and

    iv.    general corporate overhead.

b.    <u>Underwriting Gain</u>—The actuary should include a provision for underwriting gain, which is typically expressed as a percentage of the premium rate, to provide for the cost of capital and a margin for risk or contingency. The underwriting gain provision provides compensation for the risks assumed by the **MCO**. These risks may include insurance, investment, inflation, and regulatory risks, as well as risks associated with social, economic, and legal environments. The actuary should consider the effect of any risk sharing arrangements discussed in section 3.2.14, and **performance withholds** and incentives discussed in section 3.2.15.

The methods used to develop the underwriting gain provision of the **capitation rate** should be appropriate to the level of capital required and the type and level of risk borne by the **MCO**. The actuary may reflect investment income in establishing the underwriting gain component of the **capitation rate**, although an explicit adjustment is not required. Elements of investment income that the actuary may reflect include investment income from insurance operations and investment income on capital and underlying cash flow patterns.

An actuary working on behalf of an **MCO** may determine that a negative underwriting gain is appropriate for that plan's circumstances. In this case, the negative underwriting gain should be disclosed in the actuarial communication.

9

**ASOP No. 49—March 2015**

c.    Income Taxes—The actuary should consider the effect of expected income taxes on the underwriting gains and investment income retained by the **MCO**.

d.    Taxes, Assessments, and Fees—The actuary should include an adjustment for any taxes, assessments, or fees that the **MCOs** are required to payout of the **capitation rates**. If the tax, assessment, or fee is not deductible as an expense for corporate tax purposes, the actuary should apply an adjustment to reflect the costs of the tax. Taxes, assessments, and fees may differ among the **MCOs** in the program. The actuary preparing a certification under 42 CFR 438.6(c) should consider the need to adjust **capitation rates** for each **MCO** to reflect each **MCO's** expected expenses for these items.

3.2.13    Risk Adjustment—An actuary working on behalf of the state should determine whether to adjust capitation payments to different **MCOs** by using a **risk adjustment** methodology. Considerations in making this determination include program enrollment procedures that may affect differences in risk across **MCOs** or among the populations used to develop the rates and to which the rates will be applied, data availability and quality, timing, and other practical considerations including cost. ASOP No. 45, *The Use of Health Status Based Risk Adjustment Methodologies*, provides further guidance. Risk-adjusted rates that may be developed from **actuarially sound** base rates and application of an appropriate risk adjustment method are considered **actuarially sound**, even if the resulting rates fall outside of the unadjusted rate ranges or vary from the single point rates.

The actuary, whether working on behalf of the state or an **MCO**, should understand and consider the potential impact of the **risk adjustment** methodology being used, if any, on the **capitation rate**.

3.2.14    Reinsurance, Risk Corridors, and Other Risk Sharing Arrangements—The actuary should consider the effect of any risk sharing arrangements between the **MCO** and the state Medicaid agency or the federal government.

The actuary should consider how payments related to risk sharing arrangements have been reported in the base period data, how these payments are to be estimated in the future, and how these payments will be reflected in the **capitation rates**.

3.2.15    Performance Withholds and Incentives—The actuary should consider how the existence of the withholds and incentives will affect the plan costs, including claims and administration costs. The **capitation rates** should reflect the value of the portion of the withholds for targets that the **MCOs** can reasonably achieve. The **capitation rates** should not reflect the value of incentives. The actuary should also consider any limitations to the amount of incentive payments or withholds specified in legislative regulations or guidance.

10

**ASOP No. 49—March 2015**

    3.2.16 <u>Minimum Medical Loss Ratios</u>—The actuary should consider governmental and contractual **minimum medical loss ratio** requirements as well as the sharing of gains or losses. Such provisions may affect the underwriting gain provision component of the **capitation rates**.

    3.2.17 <u>State Initiatives</u>—In setting capitation rates, the actuary should only include the impact of state initiatives that are supported by corresponding cost saving policies including, but not limited to, program changes or reimbursement changes.

    3.2.18 <u>Inaccurate or Incomplete Information Identified after Opinion or Rate Certification</u>—If the actuary determines after the opinion or certification was issued that he or she used inaccurate or incomplete information, the actuary should notify the principal if, in the actuary's professional judgment, the new information is material to the **actuarial soundness** of the rates and is not inherent in the assumptions already included in the rates.

3.3    <u>Qualified Opinion on Actuarial Soundness</u>—The actuary should provide a qualified opinion if, in the actuary's judgment, the rates are not **actuarially sound**. Further, the opinion should be qualified if a negative underwriting gain is determined to be appropriate for a specific plan's circumstance by an actuary working on behalf of an **MCO**.

3.4    <u>Documentation</u>—The actuary should document the methods, assumptions, procedures, and sources of the data used. The documentation should be in a form such that another actuary qualified in the same field could assess the reasonableness of the work. The actuary should consider documentation to address the Centers for Medicare & Medicaid Services' regulations specific to Medicaid managed care **capitation rate** development and certification. For further guidance, see ASOP No. 23, *Data Quality*; ASOP No. 25, *Credibility Procedures*; and ASOP No. 41, *Actuarial Communications.*

Section 4. Communications and Disclosures

4.1    <u>Communications</u>—When issuing actuarial communications under this standard, the actuary should refer to ASOP No. 41.

4.2    <u>Disclosures</u>—The actuary should include the following, as applicable, in an actuarial communication:

    a.    as required by 42 CFR 438.6(c), a statement that **capitation rates** provided with a rate certification are considered "**actuarially sound**," according to the following criteria:

        1.    the **capitation rates** "have been developed in accordance with generally accepted actuarial principles and practices";

11

### ASOP No. 49—March 2015

      2.      the **capitation rates** "are appropriate for the populations to be covered, and the services to be furnished under the contract"; and

      3.      the **capitation rates** "have been certified, as meeting the requirements of this paragraph [42 CFR 438.6(c)], by actuaries who meet the *Qualification Standards* established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board."

b.      the definition of "**actuarial soundness**";

c.      disclosure of any items causing the opinion to be qualified such as the use of a negative underwriting gain by an actuary working on behalf of a Medicaid **MCO**;

d.      the disclosure in ASOP No. 41, section 4.2, if any material assumption or method was prescribed by applicable law (statutes, regulations, and other legally binding authority);

e.      the disclosure in ASOP No. 41, section 4.3., if the actuary states reliance on other sources and thereby disclaims responsibility for any material assumption or method selected by a party other than the actuary; and

f.      the disclosure in ASOP No. 41, section 4.4, if, in the actuary's professional judgment, the actuary has otherwise deviated materially from the guidance of this ASOP.

12

**ASOP No. 49—March 2015**

**Appendix1**

**Background and Current Practices**

*Note*: This appendix is provided for informational purposes only and is not part of the standard of practice.

Background

Medicaid is a program that pays for health care services for certain low-income persons in the United States and its Territories, as authorized by Title XIX of the Social Security Act. The federal and state governments cooperatively administer Medicaid. The Centers for Medicare & Medicaid Services (CMS) is the agency charged with administering Medicaid on behalf of the federal government. The federal government establishes certain requirements for Medicaid, and the states administer their own programs. The federal government and the states share the responsibility for funding Medicaid.

Medicaid programs were originally fee-for-service (FFS) programs in which the state paid the providers directly. In the 1980s, some states began to contract with managed care organizations (MCOs) to provide health care services for selected subsets of the Medicaid population. In some cases, states may need to obtain a CMS waiver in order to waive certain Medicaid regulations and contract with MCOs. In many states, the state or its contractor develops capitation rates that are offered to the MCOs, rather than the MCOs proposing rates to the state. Under this arrangement, typically the MCOs may accept the rates or decline to participate in the program, though some negotiation may be possible.

Beginning in August 2003,the capitation rates paid by the state to the MCOs must be certified as actuarially sound under 42 CFR 438.6(c). The actuary performing the rate certification process may be an employee of the state Medicaid agency or contracted as a consulting actuary. Normally, the certifying actuary will not have as specific knowledge of each MCO's operations and experience as an actuary working on behalf of the MCO. The soundness certification applies to all contracted capitation rates. However, the actuary is not certifying that the capitation rates are appropriate for an individual MCO.

Since the federal regulations took effect, actuaries have used various methods to prepare the capitation rates. This ASOP has been developed to incorporate the appropriate aspects of these methods to establish guidance and considerations in the rate development process.

13

**ASOP No. 49—March 2015**

Current Practices

The current Medicaid capitation rate setting and certification methodology varies state by state, but actuaries across the country use many of the considerations outlined in the ASOP. Actuaries rely on the August 2005 practice note and traditional health care actuarial principles in the development of the actuarially sound capitation rates.

In many states, the capitation rates are developed independently by the state Medicaid agency and the certifying actuary. The capitation rates are often offered to the contracting MCO without negotiation, but the contracting MCOs and their actuaries may have the ability to review the capitation rate development and provide comment. Further, a state Medicaid agency may negotiate rates with each MCO based on a rate range or allow a competitive bid. Due to the unique nature of these contracting arrangements, the certifying actuary has a greater responsibility in the determination of the capitation rates (either the point estimates or capitation rate ranges), since the certifying actuary is not directly affiliated with the contracted MCO.

Actuaries rely on data and information provided by the state Medicaid agency, the contracted MCOs, and other publicly available information. Actuaries may publish a data book that outlines the baseline data, adjustments to the baseline data, actuarial assumptions, and the development of capitation rates. Public meetings may be held where the capitation rate development process is presented to the contracted MCOs. Following the public meetings, the MCOs may provide questions to the state Medicaid agency and the certifying actuary regarding the capitation rate development process and assumptions. The certifying actuary reviews the comments and adjusts the capitation rates, if appropriate.

The state Medicaid agency presents the actuarial rate certification and related documentation to CMS for review and approval. CMS may submit questions to the state Medicaid agency and the certifying actuary regarding the capitation rate development and the related contract with the MCOs. The certifying actuary will often provide written responses to CMS.

Additional Resources

The following resources may assist in furthering actuaries' understanding of the capitation rate development process.

- American Academy of Actuaries, Health Council Practice Note, *Actuarial Certification of Rates for Medicaid Managed Care Programs,* August 2005, http://actuary.org/content/actuarial-certification-rates-medicaid-managed-care-programs

- Centers for Medicare and Medicaid Services, Medicaid website, http://medicaid.gov/

14

**ASOP No. 49—March 2015**

- Medicaid and CHIP Payment and Access Commission (MACPAC),
  http://www.macpac.gov/

- CMS Medicaid Managed Care Rate Setting Guidance, 2015
  http://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/managed-care/downloads/2015-medicaid-manged-care-rate-guidance.pdf

- Federal Register / Vol. 67, No. 115 / Friday, June 14, 2002 / Rules and Regulations, page 41097, Sec. 438.6 Contract Requirements (c) Payments under risk contracts,http://www.cms.gov/Regulations-and-Guidance/Regulations-and-Policies/QuarterlyProviderUpdates/downloads/cms2104f.pdf

15

## ASOP No. 49—March 2015

**Appendix 2**

**Comments on the Exposure Draft and Responses**

The exposure draft of proposed ASOP, *Medicaid Managed Care Capitation Rate Development and Certification*, was issued in December 2013 with a comment deadline of May 15, 2014. Twenty-six comment letters were received, some of which were submitted on behalf of multiple commentators, such as by firms or committees. For purposes of this appendix, the term "commentator" may refer to more than one person associated with a particular comment letter. The Medicaid Task Force and the Health Committee of the Actuarial Standards Board carefully considered all comments received, and the Health Committee and ASB reviewed (and modified, where appropriate) the changes proposed by the Task Force.

Summarized below are the significant issues and questions contained in the comment letters and the responses.

The term "reviewers" in appendix 2 includes the Task Force, Health Committee, and the ASB. Also, unless otherwise noted, the section numbers and titles used in appendix 2 refer to those in the exposure draft.

| TRANSMITTAL MEMORANDUM QUESTIONS | |
|---|---|
| **Question 1: This ASOP has been prepared to apply both to actuaries developing actuarial statements of opinion for a Medicaid MCO and to actuaries developing rate certifications under 42 CFR 438.6(c).Is this appropriate? Or, should the ASOP be limited to actuaries developing rate certifications under 42 CFR 438.6(c)?** | |
| Comment | Several commentators indicated support for both limiting the ASOP to 42 CFR 438.6(c) rate certifications and for applying it to all Medicaid rate setting actuarial opinions; however, the majority of the responses supported having the ASOP apply to all Medicaid rate development statements of actuarial opinion. |
| Response | The reviewers believe that the ASOP provides appropriate guidance and covers appropriate situations involving Medicaid capitation rate development, Medicaid certifications, and Medicaid statements of actuarial opinion. |
| **Question 2: As written, this ASOP applies to Children's Health Insurance Program (CHIP) managed care capitation rate development. Is this appropriate?** | |
| Comment | Several commentators supported having the ASOP apply to CHIP capitation rate development and certification. Additionally, comments were received indicating that the ASOP should also apply to the Medicaid expansion programs. |
| Response | The reviewers retained language indicating applicability of the ASOP to CHIP capitation rate development and certification. The reviewers reviewed the ASOP language to make sure it applies to the appropriate healthcare programs funded under Title XIX (Medicaid) and Title XXI (CHIP). |

16

## ASOP No. 49—March 2015

| Question 3: Is the definition of "actuarially sound/actuarial soundness" in section 2.1 clear? | |
|---|---|
| Comment | The comments received suggested that the following terms in the "actuarially sound/actuarial sound" definition be separately defined: "revenue in aggregate"; marginally or fully-loaded administrative expenses; reinsurance cash flows; underwriting gain; investment income; and taxes. |
| Response | The reviewers made no change to the definition of "actuarial soundness." The reviewers modified the definition of "underwriting gain" in section 3.2.11(b).The reviewers determined the other suggested definitions were not needed but in some cases the guidance in the standard was clarified. |
| Comment | Commentators suggested that the terms "generally accepted actuarial practices" and "certified by an actuary who meets the qualification standard" should be included in the definition of "actuarial soundness." |
| Response | The reviewers believe that the definition of "actuarial soundness" is appropriate for this standard and does not need to include these additional terms. |
| Comment | Several commentators suggested that the word "attainable" is insufficiently described. |
| Response | The reviewers determined that further description of the word "attainable" would be overly prescriptive and made no change. |
| **Question 4: Is section 3.2.16, Inaccurate or Incomplete Information Identified after Opinion or Rate Certification, which discusses the actions required of the certifying actuary if the underlying data is identified to be inaccurate or incomplete, clear and appropriate?** | |
| Comment | Commentators suggested that additional information should be provided regarding who the actuary should notify if the actuary determines that the capitation rates should be changed due to inaccurate or incomplete data, to include CMS or MCOs. |
| Response | The reviewers disagree and believe that the requirement to provide notice to the principal is sufficient and, therefore, made no change. |
| Comment | Commentators suggested providing clear guidelines on a process for reporting inaccuracies and including the new or corrected information in the rate development, and increasing transparency when this situation arises and the rates are corrected. |
| Response | The reviewers disagree that the ASOP should specify such a process and, therefore, made no change. |
| Comment | Commentators suggested providing MCOs with a process for sending information to the actuary about errors in the data. |
| Response | ASOPs provide guidance for actuaries, not organizations. The reviewers disagree that the ASOP should specify such a process and, therefore, made no change. |
| Comment | Two commentators were concerned that the term "incomplete" would be misinterpreted to mean that the actuary would need to change the rates due to prospective assumptions not equaling actual assumptions. |
| Response | The reviewers believe that the ASOP appropriately differentiates between incomplete data and prospective assumptions and, therefore, made no change. |
| Comment | Two commentators did not understand the timing around making a correction given the words "If prior to issuance..." in the section. |
| Response | The reviewers revised this section to address this comment. |

17

**ASOP No. 49—March 2015**

| Question 5: Does the ASOP restrict practice inappropriately? | |
|---|---|
| Comment | Most commentators stated that the ASOP does not restrict practice inappropriately. Two commentators thought it restricted practice if it applies to actuaries that develop rates outside of 42 CFR 438.6(c). One commentator felt that the guidelines around development of the administrative components of the rates were too prescriptive. |
| Response | The reviewers made some revisions to the guidance to address the comments expressing concern regarding inappropriate restriction of practice. |
| **Question 6: Does this ASOP provide sufficient guidance for actuaries practicing in these areas?** | |
| Comment | Several commentators indicated that the ASOP provided sufficient guidance and some that indicated the ASOP did not provide sufficient guidance. Where commentators indicated the ASOP did not provide sufficient guidance, some provided general recommendations while others provided more specific recommendations. |
| Response | While some commentators indicated that the ASOP did not provide sufficient guidance, in most cases they provided specific comments on where they believed additional guidance was necessary. The reviewers have addressed those comments in the relevant sections. |
| **Question 7: Does this ASOP provide sufficient guidance to actuaries in identifying and addressing potential inconsistencies in the expectations of actuaries working for Medicaid MCOs and those actuaries working for State Medicaid Agencies?** | |
| Comment | Commentators were divided in their response to this question. Several commentators believed that the ASOP did provide sufficient guidance on this topic. Several other commentators believed that the ASOP should provide additional guidance, either generally or in specific sections. Several other commentators believed that the ASOP did not provide sufficient guidance, but that the ASOP should be limited to actuaries working for state Medicaid agencies and thus did not need to provide additional guidance. |
| Response | The reviewers determined that the ASOP should apply to both actuaries working for Medicaid MCOs and actuaries working for state Medicaid agencies. The reviewers made clarifications and modifications in relevant sections in response to the comments received. |
| Comment | Several commentators felt that the ASOP could go further in addressing these differences. One commentator asked if there could be an illustration of circumstances when the MCO actuary is not certifying compliance with 42 CFR 438.6(c) and is not bound by the ASOP; and sought clarification of whether or not the MCO actuary needed to comply with the ASOP when completing a certification. Another commentator suggested further guidance on issues for actuaries working for state Medicaid agencies. |
| Response | The reviewers note the MCO actuary would be required to comply with the ASOP regardless of whether or not the actuary is completing a certification related to the 42 CFR 438.6(c). The reviewers modified the scope section by adding examples of situations to which the ASOP applies. |
| **SECTION 1. PURPOSE, SCOPE, CROSS REFERENCES, AND EFFECTIVE DATE** | |
| **Section 1.1, Purpose** | |
| Comment | Several commentators questioned the applicability of the ASOP to various populations including: the Aged, Blind and Disabled - SSI population, ACA Medicaid expansion populations, and Medicare-Medicaid dual integration populations. |
| Response | The reviewers reviewed the ASOP language to make sure it applies to the appropriate healthcare programs funded under Title XIX (Medicaid) and Title XXI (CHIP) and made no change. |

18

## ASOP No. 49—March 2015

| SECTION 2. DEFINITIONS | |
|---|---|
| **Section 2.3, Capitation Rate** | |
| Comment | One commentator mentioned the particular situation in Minnesota where risk is shared with providers. The suggestion was made to add a phrase to the end of the definition "or with providers." |
| Response | The reviewers agree and modified the definition. |
| **Section 2.8, Intergovernmental Transfers (IGTs)** | |
| Comment | One commentator recommended that the ASOP define medical and non-medical IGTs and to consider whether or not the actuary should be required to report certain IGTs separately if they increase the federal government or state share of Medicaid costs. |
| Response | The reviewers believe this type of reporting is beyond the scope of the standard and made no change. |
| **Section 2.10, Medical Education Payments** | |
| Comment | One commentator suggested noting that medical education payments may be made directly from the state to the providers. |
| Response | The reviewers believe that the definition addresses this situation and made no change. |
| Comment | One commentator suggested expanding this section to discuss all supplemental payments and not just medical education payments. |
| Response | The reviewers note that section 3.2.6, Special Payments, was modified to include supplemental payments as one example of special payments. The reviewers believe the revised section appropriately covers special payments, including supplemental payments. |
| **Section 2.15, Risk Adjustment** | |
| Comment | One commentator wanted the definition of "risk adjustment" expanded to include capitation rate structural elements used such as maternity delivery case rate payments. |
| Response | The reviewers believe this is addressed in section 3.2.2, Structure of the Medicaid Managed Care Capitation Rates, as amended, and made no change to section 2.15. |
| **Section 2.17, State Plan Services** | |
| Comment | Several commentators requested clarification on definitions related to "state plan services," "covered services," and "in-lieu-of services." |
| Response | The reviewers modified section 3.2.5, Covered Services, to provide additional clarity. |
| SECTION 3. ANALYSIS OF ISSUES AND RECOMMENDED PRACTICES | |
| **Section 3.1, Overview** | |
| Comment | Several commentators recommended that language be added stating that the rates [under 42 CFR 438.6 (c)] should be appropriate for each individual MCO, with one commentator stating that such appropriateness should be achieved using risk adjustment. |
| Response | The reviewers note that certification of capitation rates under 42 CFR 438.6 (c) for individual MCOs is allowed under this standard but do not believe it should be required by the standard. Therefore, no change was made. |
| Comment | One commentator recommended that the ASOP clarify that the actuary may, in some circumstances, be certifying different rates by MCO. |
| Response | The reviewers agree and believe the standard makes clear this is permitted and made no change. |
| Comment | One commentator recommended that the ASOP explicitly prohibit actuaries from considering state budgetary limitations when setting rates. |
| Response | The reviewers have added additional guidance related to state initiatives in section 3.2.17. |

19

### ASOP No. 49—March 2015

| Section 3.2.1, Form of the Capitation Rates (Single Rate or Capitation Rate Ranges) | |
|---|---|
| Comment | Several commentators recommended that the ASOP state or reinforce that the assumptions used to develop rates at each end of the rate range should be attainable and consider the interdependence of various assumptions and not just represent an aggregation of the best or worst case scenarios for each rating variable. |
| Response | The reviewers believe that the definition of actuarial soundness addresses this issue and made no change. |
| Comment | One commentator recommended that the rate range width should be required to be disclosed. |
| Response | The reviewers believe that requiring such a disclosure is beyond the scope of this ASOP and made no change. |
| Comment | One commentator recommended defining the midpoint of the rate range as the best estimate, and several commentators recommended that further requirements be added to inform the principal (state or MCO) of the effect of the choice of the rate within the rate range. |
| Response | The reviewers believe such a change would not be appropriate and made no change. |
| Comment | One commentator recommended that the ASOP clarify that maternity case rate payments and other event based payments are covered by this ASOP. |
| Response | The reviewers agree and have updated section 3.2.2, Structure of the Medicaid Managed Care Capitation Rates, to also include event based payments. |
| Comment | One commentator recommended clarifications around assumptions specific to geographic areas and that administrative expenses may be higher on the low end of the rate range than on the high end of the rate range. |
| Response | The reviewers believe that the definition of actuarial soundness addresses this issue and made no change. |
| Section 3.2.2, Structure of the Medicaid Managed Care Rates | |
| Comment | Several commentators recommended that section 3.2.2 clarify that event based (i.e., case rate) payments are also capitation rates. |
| Response | The reviewers agree that adding event based payments to this section would be helpful and updated the language. |
| Comment | One commentator recommended that section 3.2.2 reference ASOP No. 12, *Risk Classification*. |
| Response | The reviewers agree that such reference would be helpful and added it. |
| Comment | One commentator recommended that the list of examples should include Medicaid eligibility groups. |
| Response | The reviewers agree and added "Medicaid eligibility groups" to the list of examples. |
| Comment | One commentator recommended that "MCO differences" be excluded from the list of examples because it implied that MCOs with inefficient cost structures would be rewarded. |
| Response | The reviewers note that the listing only provides examples of characteristics that may affect the rating structure. Therefore, no change was made. |
| Comment | One commentator stated clarification should be provided that not all assumptions need to be developed at the rate cell level, including the standard practice of administrative loads being applied uniformly across rate cells. |
| Response | The reviewers do not believe that further clarification needs to be provided and made no change. |

20

## ASOP No. 49—March 2015

| | |
|---|---|
| Comment | Several commentators believed that the ASOP would require separate administrative loads be developed for each rate cell and recommended not requiring this. |
| Response | The reviewers believe that the ASOP allows the actuary to use his or her judgment about whether or not a single administrative load, margin, or cost of capital assumption is appropriate for all rate cells. Therefore, no change was made. |
| Comment | One commentator suggested including a definition regarding a "competitive procurement." |
| Response | The reviewers disagree that this definition needs to be included in the ASOP and made no change. |
| Comment | One commentator requested the inclusion of a definition of "covered services." |
| Response | The reviewers believe section 3.2.5, Covered Services, provided appropriate guidance and did not add a definition. However, some clarifications were made to section 3.2.5. |
| Comment | One commentator requested clarification of the terms "should" or "should consider." |
| Response | The reviewers note these terms are discussed in ASOP No. 1, *Introductory Actuarial Standard of Practice*, and made no change. |
| Comment | One commentator stated that language regarding non-state plan services is not appropriate since it is a regulatory issue and not an actuarial requirement. |
| Response | The reviewers believe that the ASOP provides appropriate guidance regarding the treatment of enhanced or additional benefits in the rate certification process and made no change. |
| Comment | One commentator stated that data quality issues should be further addressed in the ASOP. |
| Response | The reviewers believe this ASOP, in conjunction with ASOP No. 23, *Data Quality*, appropriately addresses data quality and made no change. |
| Comment | One commentator stated the need for the ASOP to address the impact on third party vendors or providers that may be receiving a sub-capitation payment from the health plan to the provider. |
| Response | The reviewers believe that financial impacts to third-party vendors are outside the scope of this standard and made no change. |
| **Section 3.2.3, Rebasing and Updating of Rates** | |
| Comment | One commentator suggested that the practice of using interim financial results to develop an experience adjustment was essentially rebasing and this practice should be addressed in section 3.2.3. |
| Response | The reviewers believe that the existing language appropriately addresses such situations, even though it does not specifically describe this practice. Therefore, no change was made. |
| Comment | One commentator suggested that competitive procurements were a form of rebasing and this should be addressed in the rebasing section. |
| Response | The reviewers did not feel that a discussion of competitive procurements was warranted in this section and made no change. |
| Comment | Several commentators recommended that the ASOP require actuaries to consider the adequacy of the rates in total or by rate cell in deciding whether to rebase. |
| Response | The reviewers note that rate adequacy is addressed in other areas of the ASOP and, therefore, made no change. |
| Comment | One commentator recommended that program and benefit changes be a required consideration in rebasing rates. |
| Response | The reviewers believe this is dependent on specific facts and circumstances, and therefore made no change. |

Ex. 5 - Wilson Decl.
Page 26 of 33

## ASOP No. 49—March 2015

| | |
|---|---|
| Comment | One commentator recommended that capitation rate development, including the rebasing of rates, should occur and be distributed to interested parties well in advance of the effective date of rates. |
| Response | The reviewers believe this recommendation is outside the scope of the ASOP and made no change. |
| **Section 3.2.5, Covered Services** | |
| Comment | One commentator thought that "in lieu of services" should be defined or clarified given that policy and regulatory considerations impact the appropriateness of including these services in the rate development. Another commentator thought that the word "may" should be changed to "should" in the sentence "Non-state plan services may be included in the capitation rate if the service is provided in lieu of a state plan service." Another commentator thought that this section should clarify that costs incurred for the use of innovative, non-traditional programs that obviate the need for or reduce medical costs and improve patient care should be included as covered services. |
| Response | The reviewers note section 3.2.5 was divided into two sections in the final ASOP (section 3.2.5, Covered Services, and new section 3.2.6, Special Payments). The reviewers believe the updated sections are clear and appropriate. |
| Comment | One commentator noted that the sentence "In determining covered services, the actuary should include state plan services that form the basis for the claims experience used to develop the rates" was difficult to read. |
| Response | The reviewers modified section 3.2.5 and believe the guidance on determining covered services is clear. |
| Comment | One commentator indicated that the use of the word "consistently" in the sentence "The actuary should also identify any special payments to providers (for example, supplemental payments or bonuses) and make sure that these payments are handled consistently between the base data and the capitation rates" should be modified to reflect that there are situations where there is a change in practice between the base period and rating period. |
| Response | The reviewers agree and revised this sentence, which is now included in new section 3.2.6, Special Payments. |
| Comment | One commentator noted that the phrase "enhanced or additional services" should be "enhanced or additional benefits" to be consistent with the definitions. |
| Response | The reviewers agree and revised the word "services" to "benefits" in this phrase. |
| Comment | One commentator noted that if a definition for "covered services" is added to the definitions there may be no need to include the words "unless provided for by a waiver" at the end of the section. |
| Response | The reviewers modified section 3.2.5 and believe the guidance on determining covered services is now clear. |
| Comment | One commentator asked for further clarification of state plan, non-state plan and in-lieu-of benefits. |
| Response | The reviewers modified section 3.2.5 and believe the guidance regarding covered services is now clear. |
| Comment | One commentator asked that the ASOP include a definition regarding "critical access hospitals." |
| Response | The reviewers disagree that this definition needs to be included in the ASOP and made no change. |

22

## ASOP No. 49—March 2015

| Section 3.2.7, Other Base Data Adjustments | |
|---|---|
| Comment | One commentator recommended adding two additional paragraphs related to "area factor adjustments" and "affiliated provider organizations." |
| Response | The reviewers disagree that these items should be included in this section. The reviewers believe sections 3.2.2, Structure of the Medicaid Managed Care Capitation Rates; section 3.2.4, Base Data; and section 3.2.9, Claim Cost Trends, adequately address this issue, and therefore made no change. |
| Comment | One commentator thought that this section should include a section on a base data adjustment for potential increased access in the managed care program versus what was available in a fee-for-service program. |
| Response | The reviewers disagree and believe section 3.2.9 adequately addresses this issue. Therefore, no change was made. |
| Comment | Two commentators thought that this section did not address adjustments needed for missing or incomplete encounter data. |
| Response | The reviewers disagree. The examples in the section 3.2.7(a) are not all-inclusive. Therefore, no change was made. |
| Comment | One commentator proposed expanding section 3.2.7(a)(1) to read "certain claims or a portion of provider payments are not processed through the same system as the base data;" in order to include consideration for bulk retrospective provider payments such as "pay for performance" incentives that may not be attributable to particular claims. |
| Response | The reviewers believe this issue does not warrant a specific example and made no change. |
| Comment | One commentator thought that the sentence "The actuary should consider other base data adjustments, which may include the following:" should be changed to "The actuary should consider other base data adjustments, which should include the following to reflect all applicable costs incurred during the base data period:" |
| Response | The reviewers believe the language as written is clear and made no change. |
| Comment | One commentator recommended that section 3.2.7(f) explicitly mention changes in medical practice, including newly approved drugs and devices, as a situation in which base data and capitation rates may need to be adjusted. |
| Response | The reviewers believe this issue does not warrant a specific example and made no change. |
| Comment | One commentator recommended that the ASOP be revised to provide that actuaries should disclose to MCOs the methodology, assumptions, and data that serve as the basis for adjustments to base year data. The commentator also recommended that language be added to section 3.2.7 stating that actuaries should avoid using Fee for Service (FFS) data as the basis for the base data adjustments if the FFS data is more than one year removed from the rating year. |
| Response | The reviewers believe that section 4 of this ASOP and other applicable ASOPs (including ASOP No. 41, *Actuarial Communications*) provide appropriate guidance regarding disclosures. The reviewers disagree with adding specific instructions around what data may or may not be used to develop base year data adjustments. ASOP No. 23 provides the actuary with guidance for data selection. Therefore, no change was made. |

Ex. 5 - Wilson Decl.
Page 28 of 33

## ASOP No. 49—March 2015

| Section 3.2.8, Claim Cost Trends | |
|---|---|
| Comment | One commentator suggested that a list of items for developing claim cost trends should be added to this section. |
| Response | The reviewers believe the level of detail in this section is sufficient and made no change. |
| Comment | One commentator thought that the actuary should be directed in this section to disclose the basis of trend estimates such as the source, applicability, claims experience, time periods, trend surveys, etc. |
| Response | The reviewers disagree and believe that section 4 of this ASOP and other applicable ASOPs (including ASOP No. 41) provide appropriate guidance regarding disclosures. Therefore, no change was made. |
| Comment | One commentator thought that the wording "Trends should be exclusive of other adjustments" indicated that a blending of the utilization component of trend with the adjustment in section 3.2.9, Managed Care Adjustments, was prohibited; yet they felt that if historic managed care data was used to develop the trends, it would be an unnecessary exercise to separate historical utilization trend and managed care savings components. |
| Response | The reviewers revised the sentence for clarity and believe no further guidance is necessary. |
| Comment | Two commentators recommended that this section be amended to add a requirement that actuaries should reflect new technological and pharmaceutical advancements in the trend assumptions. |
| Response | The reviewers believe the level of detail in this section is sufficient and made no change. |
| Comment | One commentator requested a specific section on network re-pricing and stated this section should specify that the fee schedule used to re-price claims be attainable to the MCOs. |
| Response | The reviewers believe that this issue is covered by the definition of "actuarial soundness." Therefore, no change was made. |
| Section 3.2.9, Managed Care Adjustments | |
| Comment | One commentator thought that the ASOP should clarify that managed care savings should be documented by category of service and should clarify that the level of managed care adjustments should not be linking to non-medical loads in the rate development. |
| Response | The reviewers disagree that this wording should be added and made no change. |
| Comment | One commentator suggested that the ASOP clarify that managed care impacts must be considered in aggregate and not in isolation (for example, reduction in ER utilization may be accompanied by higher primary care utilization, possibly with higher per unit costs in both settings, as delivery of care is managed towards the appropriate setting.). |
| Response | The reviewers disagree that this wording should be added and made no change. |
| Comment | Several commentators felt that the words "...adjustments should be attainable in the rating period..." were not sufficient guidance to recognize the various items that can impact the timing of attaining managed care savings and suggested additional wording be added to the ASOP that clarifies the limitations that can cause managed care adjustments to be obtained during the rating period. |
| Response | The reviewers believe this issue is covered by the definition of "actuarial soundness. "Therefore, no change was made. |
| Comment | One commentator thought that the wording "state contractual and operational requirements, and relevant laws and regulations" allowed actuaries to add managed care adjustments due to state budget limitations. |
| Response | The reviewers added a new section 3.2.17, State Initiatives, to clarify the guidance. |

24

## ASOP No. 49—March 2015

| | |
|---|---|
| Comment | One commentator thought that section 3.2.9(b) should be revised to "current characteristics and desired changes in those characteristics of the…." |
| Response | The reviewers believe the language is clear and, therefore, made no change. |
| Comment | Several commentators recommended that wording should be added to this section indicating that base data adjustments need to be done in a transparent and data-driven manner. |
| Response | The reviewers believe that transparency and use of underlying data are appropriately covered in this standard as well as ASOP Nos. 23 and 41 and, therefore, made no change. |
| Comment | One commentator recommended adding language that the actuary should make sure that managed care savings are not double counted with trend assumptions. |
| Response | The reviewers note this is addressed in new section 3.2.9, Claim Cost Trends. Therefore, no change was made. |
| Comment | One commentator thought that this section did not distinguish between changes from base year data that are likely to be achievable when a new Medicaid managed care program is implemented and managed care efficiencies have not previously been implemented and the nature and scope of changes that can be expected when a program is well-established and the baseline data already reflect the impact of Medicaid health plan performance. |
| Response | The reviewers note this is addressed in section 3.2.9(c) and made no change. |
| **Section 3.2.11, Non-Medical Expenses** | |
| Comment | One commenter suggested that the ASOP recommend a correlation between underwriting gain and the level of risk or uncertainty. |
| Response | The reviewers agree and have added clarifying language to section 3.2.11(b). |
| Comment | One commentator suggested that medical management costs should be considered medical expenses and not administrative costs. |
| Response | The reviewers note the ASOP only lists medical management as a possible administrative expense. Therefore, no change was made. |
| Comment | One commentator expressed concern that the ASOP requires developing distinct rates for each MCO based on administrative expenditures and profit or non-profit status. |
| Response | The reviewers note that new section 3.2.12, Non-Medical Expenses, states non-medical expenses *may* vary by MCO and, therefore, made no change. |
| Comment | One commenter expressed concern over requiring the consideration of cost of capital and stated that it should be left to the actuary to consider. |
| Response | The reviewers believe the updated ASOP includes appropriate consideration of cost of capital in section 2.1, Actuarially Sound/Actuarial Soundness and new section 3.2.12 (b), Underwriting Gain. |
| Comment | One commentator expressed concern about establishing different non-medical expenses by rate cell. |
| Response | The reviewers modified the language to remove "for each rate cell" to avoid implying that the non-medical expenses were required to vary by rate cell. |
| **Section 3.2.11(a), Administration** | |
| Comment | One commenter recommended clarifying what is an appropriate administrative load for Medicaid managed care and what are acceptable data sources or information to use. |
| Response | The reviewers believe that such clarification is not appropriate in this ASOP and therefore made no change |

25

## ASOP No. 49—March 2015

| Section 3.2.11(a)(1), Determination of Administrative Expenses | |
|---|---|
| Comment | One commentator suggested additional requirements for the actuary in determining the administrative payments to affiliated organizations to make sure they are reasonable and appropriate. |
| Response | The reviewers believe section 3.2.11 and the definition of "actuarial soundness" appropriately address this concern and made no change. |
| Comment | One commenter recommended deleting section 3.2.11(a)(1) on administrative expenses and stated that it would limit states' ability to place limits on administrative costs. |
| Response | The reviewers modified the language from "should" to "may" and also made other changes to this section to clarify guidance. |
| Comment | One commentator suggested that several of the considerations for administrative expenditures under 3.2.11(a)(1) should not be required and instead be made permissible. |
| Response | The reviewers modified the language from "should" to "may" and also made other changes to this section to clarify guidance. |
| Comment | One commentator suggested that the complexity of providing services for certain populations (such as aged or disabled enrollees) should be required as a consideration of administrative expenditures. |
| Response | The reviewers note that the list is not meant to be all inclusive. The reviewers believe the ASOP provides appropriate guidance and made no change. |
| Section 3.2.11(a)(2), Types of Administrative Expenses | |
| Comment | One commentator suggested adding contract provisions as a type of administrative expenditure. |
| Response | The reviewers believe the ASOP provides appropriate guidance and made no change. |
| Section 3.2.11(a)(2)(i), Types of Administrative Expenses | |
| Comment | One commentator suggested deleting the phrase regarding "competitive environment." |
| Response | The reviewers agree and made the change. |
| Section 3.2.11(a)(2)(iv), Types of Administrative Expenses | |
| Comment | One commentator suggested defining "general corporate overhead." |
| Response | The reviewers disagree and made no change. |
| Section 3.2.11(b), Underwriting Gain | |
| Comment | Several commentators recommended "cost of capital" be defined and explained how this related to margins for risk or underwriting gain. |
| Response | The reviewers believe the ASOP provides appropriate guidance and made no change. |
| Comment | One commentator recommended that the actuary must consider investment income when determining the underwriting gain. |
| Response | The reviewers believe the use of the word "may" is appropriate for the ASOP and made no change. |
| Comment | One commentator recommended addressing the importance of allowing negative underwriting gain margins in rate development. |
| Response | The reviewers believe the ASOP adequately addresses negative underwriting gain and, therefore, made no change. |

## ASOP No. 49—March 2015

| | |
|---|---|
| Comment | Several commentators suggested that the effects of risk sharing arrangements, performance withholds, and minimum medical loss ratios should be addressed in determining the underwriting gain assumption. |
| Response | The reviewers added language to clarify the guidance. |
| Comment | One commentator recommended that the margin for the underwriting gain should be explicit in the capitation rate. |
| Response | The reviewers believe the ASOP provides appropriate guidance and made no change. |
| Comment | One commentator asked for guidance on how an appropriate underwriting gain provision was determined and for requirements about disclosing negative underwriting gain provisions. |
| Response | The reviewers believe it is beyond the scope of the ASOP to specify how the underwriting gain provision should be determined or deemed appropriate. The reviewers note that section 4 of the ASOP provides guidance for actuarial communications and disclosures, including specific mention of disclosure of negative underwriting gains. Therefore, no change was made. |
| Comment | One commentator recommended that the ASOP address new Medicaid managed care populations in regard to the underwriting gain provision. |
| Response | The reviewers disagree that additional guidance is needed and made no change. |
| Comment | One commentator asked whether payment delays should also be considered in the standard. |
| Response | The reviewers note that "cash flow patterns" are addressed in section 3.2.11(b). Therefore, no change was made. |
| **Section 3.2.11(c), Income Taxes** | |
| Comment | One commentator recommended that section 3.2.11(c) be revised so that actuaries may consider income taxes, but would not be required to do so. |
| Response | The reviewers believe this is an appropriate consideration in setting Medicaid managed care capitation rates and made no change. |
| Comment | One commenter recommended deleting section 3.2.11(c) and making section 3.2.11(d) permissive at the state's discretion. |
| Response | The reviewers disagree and made no change. |
| **Section 3.2.11(d), Taxes, Assessments, and Fees** | |
| Comment | One commentator expressed concern that section 3.2.11(d) was too specific relative to the rest of the ASOP and that the actuary would be required to make several explicit forecasts that the actuary may not be able to do. |
| Response | The reviewers believe this section does not place an unreasonable requirement on the actuary and made no change. |
| **Section 3.2.12, Risk Adjustment** | |
| Comment | Several commentators recommended that the risk adjustment section refer to section 3.2.7 or include discussion of data quality and appropriateness for risk adjustment. |
| Response | The reviewers believe that additional guidance is not necessary since ASOP No. 23 applies and is referenced in section 3.4, Documentation, and ASOP No. 45, *The Use of Health Status Based Risk Adjustment Methodologies*, is referenced in section 3.2.12, Risk Adjustment. Therefore, no change was made. |
| **Section 3.2.14, Performance Withholds/Incentives** | |
| Comment | Several commentators suggested the actuary should document any differences between the ASOP and CMS requirements. |
| Response | The reviewers note that section 4 of this ASOP provides guidance in this area. |

## ASOP No. 49—March 2015

| Comment | Several commentators felt the language regarding including withhold amounts that are reasonably achievable was overly prescriptive while others felt the language did not provide enough guidance. |
|---|---|
| Response | The reviewers believe the language is appropriate and made no change. |
| Comment | One commentator recommended that data related to the characteristics of the covered population be considered when actuaries evaluate the effect that performance withholds and incentives could have on plan costs. The commentator also stated there should be clear expectations communicated to the MCO up front regarding targets and improvement goals before the rate period begins. |
| Response | The reviewers did not believe adding this consideration or required communication was necessary or appropriate. Therefore, no change was made. |
| **Section 3.2.15, Minimum Medical Loss Ratios** | |
| Comment | One commentator felt a statement should be added recognizing that minimum medical loss ratio provisions increase the level of risk borne by the MCO that the actuary should consider when determining the underwriting gain provision of the capitation rates. |
| Response | The reviewers note this is adequately addressed in this section and made no change. |
| **Section 3.3, Qualified Opinion on Actuarial Soundness** | |
| Comment | A commentator felt that an entire actuarial opinion should not be qualified when a negative underwriting gain is utilized. |
| Response | The reviewers note a qualified opinion is meant to highlight special circumstances with respect to actuarial soundness within the rate certification. Section 3.2.12(b), Underwriting Gain, requires the disclosure of a negative underwriting gain assumption. The reviewers changed the language from "for example" to "further". However, no other change was made. |
| **Section 3.4, Documentation** | |
| Comment | One commentator requested that the actuary be required to test capitation structures for appropriateness using emerging experience. |
| Response | The reviewers believe the ASOP provides appropriate guidance and made no change. |
| Comment | Several commentators requested that the actuary be required to provide appropriate documentation to the MCOs. |
| Response | The reviewers note the distribution of the actuary's work product and documentation is governed by ASOP No. 41 and other related ASOPs. Therefore, no change was made. |
| Comment | One commentator asked what CMS regulations actuaries should consider in their documentation. |
| Response | The reviewers believe that listing all specific regulations the actuary should consider is outside the scope of this ASOP and made no change. |