IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**PATRICK ALLEN**, in his official capacity
as director of, OREGON HEALTH
AUTHORITY, an agency of the State of
Oregon,

               Plaintiff,

    v.

**FAMILYCARE, INC.**, an Oregon non-
profit corporation,

               Defendant.

Case No. 3:18-cv-00212-MO (Leading)
Case No. 6:18-cv-00296-MO (Trailing)

**OPINION AND ORDER**

_____

**FAMILYCARE, INC.**, an Oregon non-
profit corporation,

               Plaintiff,

**OREGON HEALTH AUTHORITY**, an
agency of the State of Oregon, and
**PATRICK ALLEN**, both individually and
in his official capacity as director of the
Oregon Health Authority,

               Defendants.

1

**MOSMAN, J.,**

This matter comes before me on Oregon Health Authority's Motions to Dismiss [24], [79] and FamilyCare Inc.'s Motion to Dismiss [27].[1]

## BACKGROUND

Medicaid is a national medical assistance program that provides medical care for low-income and disabled individuals. *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 610 (2012). It is administered at the federal level by the Department of Health and Human Services' Centers for Medicare & Medicaid Services ("CMS"). *Id.* Under the program, the CMS provides financial assistance to participating states to reimburse the cost of providing medical care to the states' Medicaid-eligible citizens. *Id.* To qualify for federal funds, a state must submit to CMS "a state Medicaid plan that details the nature and scope of the state's Medicaid program," and CMS must approve the plan. *Id.*; *see also* 42 U.S.C. § 1396a(a), (b); 42 C.F.R. § 430.10. Participation is voluntary, but once a state chooses to participate, it must comply with the Medicaid Act and its implementing regulations. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

Oregon's Medicaid Program, known as the Oregon Health Plan, is administered by the Oregon Health Authority ("OHA") and operates with federal approval as a "demonstration project" under Section 1115 of the Social Security Act. ORS 413.032; Compl., Case 3:18-cv-00212 [1] [hereinafter "OHA Complaint"] ¶ 13-14; see 42 U.S.C. § 1315. Section 1115 gives CMS the authority to approve experimental state plans and in turn gives states additional flexibility to design and improve their Medicaid programs for the benefit of their citizens. 42 U.S.C. § 1315; OHA Complaint ¶ 13.

---

[1] Unless otherwise stated, this Opinion cites docket numbers from the Leading Case, No. 3:18-cv-00212-MO.

2

OHA has implemented one such plan in which it contracts with Coordinated Care Organizations ("CCOs"), which in turn contract with health care providers to provide care. OHA Complaint ¶¶ 11–12. Federal law and regulations require OHA to submit its contracts with CCOs to CMS for approval each year. 42 U.S.C. § 1396b(m)(2)(A)(iii); 42 C.F.R. § 438.4(b). If the contracts are not approved, CMS will withhold federal funding. *See* 42 U.S.C. § 1396b(m)(2)(A)(iii). Among other requirements, the contract rates must be actuarially sound. *Id.* State law incorporates these requirements. *See* ORS 413.071 ("Notwithstanding any other provision of law, federal laws shall govern the administration of federally granted funds."); *see also* OAR 410-141-3010(14) ("The Authority shall interpret and apply this rule to satisfy federal procurement and contracting requirements in addition to state requirements applicable to contracts with CCOs. The Authority must seek and receive federal approval of CCO contracts.").

FamilyCare, Inc. is one such CCO. Third Am. Compl., Case 3:18-cv-00296 [1] Ex. 1 at 501–53 [hereinafter "FamilyCare Complaint"] ¶ 11. Operating since 1985, it was the second-largest CCO in Oregon before it shut down early this year. *Id.* ¶¶ 1, 4.

In 2014, FamilyCare signed a five-year contract ("the Contract") with OHA to operate as a CCO. *Id.* ¶ 20. Since at least 2015, FamilyCare has battled with OHA over the per person ("capitation") rates OHA set for FamilyCare. *See id.* ¶ 21. Generally, FamilyCare alleges that OHA made actuarial errors that resulted in too-low rates for FamilyCare and other CCOs. *Id.* ¶¶ 20–23. FamilyCare first filed suit against OHA in May 2015. *Id.* ¶ 23. There, it alleged that its 2015 rates, which had decreased FamilyCare's capitation by over 10%, were not actuarially sound. *Id.* ¶¶ 21–25; *id.*, Ex. 2. FamilyCare sued again in 2016. *Id.* ¶ 28. The parties reached a settlement agreement ("the Settlement Agreement") to resolve both suits. *Id.* ¶¶ 30–33. Among

other provisions, FamilyCare agreed to the lower rates, and OHA gave FamilyCare a $24.8 million settlement credit. *Id.* ¶ 31.

But when OHA released its 2017 rates, FamilyCare again disputed the numbers. *Id.* ¶¶ 38–41. In December 2016, the parties entered into a dispute resolution agreement ("the Dispute Resolution Agreement"), in which FamilyCare accepted the 2017 rates but reserved its right to challenge them. *Id.* ¶ 39. OHA agreed to openly discuss the actuarial soundness of the rates. *Id.* ¶ 41. But, according to FamilyCare, OHA did not comply with the Dispute Resolution Agreement. *Id.* ¶¶ 47–59. FamilyCare alleges that over the course of the next few months, OHA, among other things, instituted a smear campaign ("the Communications Plan") against FamilyCare, in order to portray FamilyCare negatively in the press. *Id.* ¶ 47. The then-Director of OHA resigned after internal emails that discussed the Communications Plan were published in the news. *Id.* ¶ 59.

When she resigned, and Director Patrick Allen took over, OHA was in the process of setting 2018 rates. *Id.* ¶ 60. FamilyCare and others continued to identify suspected errors to OHA. *Id.* ¶¶ 61–70. On December 8, 2017, OHA agreed that the errors FamilyCare identified necessitated a redetermination of the rates. *Id.* ¶ 70. OHA committed to give FamilyCare a preliminary analysis of the necessary redetermination on December 29, the last business day of that year, and the last day FamilyCare could agree the 2018 rates. *Id.* ¶¶ 70–71. But on December 20, OHA told FamilyCare that it had 24 hours to decide whether to accept or reject the 2018 rates, before OHA had provided the preliminary analysis. *Id.* ¶¶ 72–75. FamilyCare decided to reject the rates, since it could not afford to accept them as they were. *Id.* ¶ 74. FamilyCare shut down. *Id.* ¶ 77.

FamilyCare sued OHA in Oregon state court. OHA removed the case to federal court. In its Third Amended Complaint (filed before the case was removed), FamilyCare asserts numerous claims against OHA associated with OHA's 2017 and 2018 rate setting process. Claim 1 of the Third Amended Complaint alleges violation under §§ 1983 and 1985. *Id.* ¶¶ 82–90. Claims 2, 3, 5, and 6 allege breach of the Settlement Agreement. *Id.* ¶¶ 91–111, 119-128. Claims 4 and 11 asserts violations of the Oregon Administrative Procedure Act and request judicial review of the 2017 and 2018 rates. *Id.* ¶¶ 112–118, 152–57. Claims 7 and 8 allege violations of the Dispute Resolution Agreement. *Id.* ¶¶ 129–38. Claim 9 asserts intentional interference with business relations. *Id.* ¶¶ 139–45. Claim 10 asserts violations of the five-year Contract. *Id.* ¶¶ 146–51.

Before FamilyCare's case was removed, OHA moved to dismiss Claims 6, 7, 8, and 9 on state law contract grounds. *See* Mot. to Dismiss [79]. The motion was fully briefed below, but I asked the parties to revise the briefs to reflect the federal standard for motions to dismiss. Minutes of Proceedings [77]. After the case was removed, OHA moved to dismiss all of FamilyCare's claims on grounds that FamilyCare had no right to actuarially-sound rates; that FamilyCare's state APA claims are preempted; and that qualified immunity bars FamilyCare's claim for damages against Director Allen in his individual capacity. Mot. to Dismiss [24].

Before it removed FamilyCare's suit, OHA filed its own declaratory judgment action. I granted the parties' motion to consolidate. Order [11]. OHA seeks a declaratory judgment that federal law provides no basis for FamilyCare to privately challenge, under the Oregon APA or otherwise, whether its rates comply with federal Medicare laws. OHA Complaint ¶¶ 31–37.

FamilyCare moved to dismiss OHA's one claim for relief. Mot. to Dismiss [27].

//

//

## LEGAL STANDARD

When evaluating a motion to dismiss under Rule 12(b)(6), courts are to accept the well-pleaded factual allegations of a complaint as true and construe all inferences in favor of the nonmoving party. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016). Dismissal under Rule 12(b)(6) is warranted if a complaint fails "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007). "Conclusory allegations of law . . . are insufficient to defeat a motion to dismiss." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cty. Of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

A pleading should be dismissed with prejudice if "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## DISCUSSION

### I.  OHA's Motion to Dismiss Claims 1–6, 8, and 10–11.

In its Motion to Dismiss [24], OHA advances four related arguments. It argues first that I should dismiss FamilyCare's claims 1–6, 8, and 10–11 on the basis that FamilyCare does not have a right to actuarially sound rates. Second, OHA argues that FamilyCare's § 1983 and § 1985 claim (claim 1) against Director Allen in his individual capacity fail because FamilyCare lacks a constitutionally protected interest in goodwill and actuarially sound rates and because any violation was not clearly established. Third, OHA contends that FamilyCare's state APA claims (4 and 11) are preempted. Fourth, OHA contends that FamilyCare's contract claims (claims 2–3, 5–6, 8, and 10) fail because FamilyCare lacks a right to actuarially-sound rates.

### A. Whether FamilyCare lacks a right to actuarially sound rates (claims 1–6, 8, 10–11)

The claims OHA moves to dismiss under this theory can be grouped into three categories: (a) a claim under § 1983 and § 1985 for due process violations (claim 1); (b) claims under the state APA for violation of state law (claims 4 and 11); and (c) claims under its contracts with OHA, for alleged violations of various contractual provisions (claims 2–3, 5–8, and 10). OHA contends that all of these claims fail because FamilyCare lacks a right to actuarially sound rates.

But OHA is wrong to suggest that each of these claims necessarily depends on a right to actuarially sound rates. OHA's reliance on *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) is misplaced, in part because *Armstrong* address rights of action, not rights. In *Armstrong,* plaintiffs were providers of habilitation services to persons covered by Idaho's Medicaid plan. 135 S. Ct. at 1382. They sued two officials in Idaho's Department of Health and Welfare in federal district court, claiming that Idaho violated Medicaid § 30(A) by reimbursing providers of habilitation services at lower rates than § 30(A) permits. *Id.* The providers asked the court to order the state officers to increase these rates. Affirming the district court, the Ninth Circuit said that the providers had an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement of or implementation of state legislation. *Id.* at 1382–83. The Supreme Court disagreed. It held that neither the Supremacy Clause, nor the equitable power of federal courts provided an implied right of action. *Id.* at 1384–86.

In its analysis of the second question—whether the suit could proceed in equity—the Court noted that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Id.* at 1385. Accordingly, the Court turned to the statute to determine whether Congress had expressly or impliedly limited the power of

federal courts to enjoin noncompliance with the Act. Here, the Court noted two aspects of § 30(A). First, it considered that the "sole remedy Congress provided for a State's failure to comply with Medicaid's requirements . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* The Court explained that this provision "might not, *by itself*, preclude the availability of equitable relief." *Id.* So the Court turned to the second aspect, which was the "judicially unadministrable nature of § 30(A)." *Id.* Section 30(A) required that state plans provide for payments that are "consistent with efficiency, economy, and quality of care." Since Congress "explicitly confer[ed] enforcement of this judgment-laden standard upon the Secretary," the Court reasoned, it is clear that "Congress wanted to make the agency remedy that it provided exclusive." *Id.* (internal quotations and citations omitted). A plurality in *Armstrong* further determined that Medicaid itself did not imply a right of action for plaintiffs to sue for violations of Medicaid section 30(A). *Id.* at 1387–88.

Thus, *Armstrong* is a right-of-action case: it asked whether the Supremacy Clause, the federal court's equitable powers, or the Medicaid Act provided the providers a vehicle to challenge the state officers' failure to comply with the Medicaid Act. Here, there is no question that FamilyCare has a right of action. In fact, it has three: FamilyCare has sued under § 1983, the Oregon APA, and state law contract remedies.

Importantly, the rights that FamilyCare seeks to enforce through those rights of action are not rights to actuarially-sound rates. Instead, FamilyCare asserts its due process rights, its right to judicial review of illegal agency action, and its contractual rights. Thus, at the initial stages of analysis, none of FamilyCare's claims depends on a right to actuarially sound rates. It would therefore be improper to dismiss the claims at the outset on that basis, even though FamilyCare's claims may ultimately implicate whether FamilyCare has a right to actuarially-sound rates.

8

### B. Whether qualified immunity bars FamilyCare's § 1983 claim (claim 1)

FamilyCare's first claim for relief alleges civil rights violations and conspiracy to commit civil rights violations on the theory that OHA deprived and conspired to deprive FamilyCare of its constitutionally-protected property interests without due process. The parties agree that FamilyCare cannot bring a claim for money damages against OHA and Director Allen in his official capacity. Accordingly, FamilyCare seeks equitable relief against Director Allen in his official capacity and $50 million in damages against Director Allen in his individual capacity.

A § 1983 claim based on procedural due process has three elements: (1) a liberty or property interested protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process. *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). FamilyCare alleges (1) that it had a constitutionally-protected property interest in its business goodwill and in actuarially sound rates; (2) that Director Allen's decision to give FamilyCare only twenty-four hours to decide whether to agree to the 2018 rates, without telling FamilyCare what those rates would be, and knowing that FamilyCare could not accept the proposed rates, deprived FamilyCare of those rights; and (3) that because FamilyCare was forced to immediately shut down, any post-deprivation process was inadequate.

Asserting qualified immunity, OHA moves to dismiss only the claim for monetary damages against Director Allen in his individual capacity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted). Under a two-step process, courts assess whether the state actor's conduct violated a constitutional right when viewed in the light most favorable to the party asserting the injury.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). If such a violation exists, courts then must determine

whether the right violated was clearly established. *Id.*; *see Pearson v. Callahan*, 555 U.S. 223,

226 (2009) (noting that courts may address these steps in either order).

### 1. Step one: whether Director Allen's conduct violated a constitutional right

At the first step, OHA argues that FamilyCare's § 1983 claim against Director Allen fails

on two independent grounds: (a) because FamilyCare failed to allege a constitutionally-protected

property interest and (b) because FamilyCare received all process due.

### a) Whether business goodwill and actuarially sound rates constitute constitutionally-protected property interests

In order to demonstrate a due process claim, a plaintiff must show that it has a liberty or

property interest protected by the Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 569

(1972). A protected property interest is present where an individual has a reasonable expectation

of entitlement deriving from "existing rules or understandings that stem from an independent

source such as state law." *Id.* at 577. "A reasonable expectation of entitlement is determined

largely by the language of the statute and the extent to which the entitlement is couched in

mandatory terms." *Ass'n of Orange Co. Deputy Sheriffs v. Gates*, 716 F.2d 733, 734 (9th

Cir.1983).

### i. Goodwill

The Ninth Circuit has held that reputation is not a constitutionally-protected property

interest; thus, to state a protected property interest in goodwill, a plaintiff must allege that it has

an interest (stemming from an independent source such as state law) that goes beyond mere

injury to business reputation. *See WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999)

(en banc). Depending on the contours of state law, then, goodwill can be a protected property interest. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315–16 (9th Cir. 1989) (recognizing protected property interest in goodwill as defined by California law).

FamilyCare does not point to an Oregon statute defining an interest in goodwill, but Oregon cases do discuss the concept. In the context of dividing marital assets, courts in Oregon have defined "goodwill" as the value of a business "over and above the value of its assets," including the "favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells." *See, e.g.*, *In re Marriage of McDuffy*, 56 P.3d 449, 453 (Or. Ct. App. 2002). Citing those cases, this Court has held that Oregon law recognizes goodwill as a property interest protected by due process. *Speeds Auto Servs. Grp., Inc. v. City of Portland*, No. 3:12-CV-738-AC, 2014 WL 2809825, at *9 (D. Or. June 20, 2014); *Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1197 (D. Or. 2011). Affirming *Westwood*, the Ninth Circuit "agree[d] with the district court that Plaintiffs' procedural due process claim based on the deprivation of their property interest in goodwill failed because the record contains no evidence of Nookie's goodwill." *Westwood v. City of Hermiston*, 496 F. App'x 728, 730 (9th Cir. 2012). Thus, this District and the Ninth Circuit have suggested that goodwill could be a protected property interest under Oregon law, as long as there is sufficient evidence.[2]

OHA points out that since *Westwood* and *Speed* both determined that there was insufficient evidence of goodwill, the issue here—whether goodwill is protected—was not integral to those decisions. OHA also criticizes those decisions' reliance on the division-of-assets

---

[2] OHA does not argue that FamilyCare lacks sufficient evidence. FamilyCare's Complaint describes the history of FamilyCare over the last thirty years, mentions FamilyCare's goodwill, and specifically describes the goodwill it has among members and providers which was, it says, a result of its commitment to providing high-quality, low-cost care. *See* FamilyCare Complaint ¶¶ 85, 86. I find that FamilyCare's Complaint alleges goodwill sufficient to survive a motion to dismiss.

cases. It argues that those cases do no more than refer to the overall value of a business, which, OHA says, is not sufficient to define a constitutionally-protected property interest.

But *Westwood* and *Speed* did hold that goodwill could constitute a protected property interest under Oregon law, even though at the next step, both decisions found that there was insufficient evidence of it on the records at issue. Since the Ninth Circuit affirmed that holding in *Westwood*, I decline to consider whether the holding improperly construed the Oregon law. Thus, I find that FamilyCare has properly asserted a constitutionally-protected interest in its goodwill.

## ii.  Actuarially sound rates

Statutes that require the government to follow certain procedures may give a private party a constitutionally-protected interest if the procedures "are intended to be a significant substantive restriction on . . . decision making." *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984).

For example, the Ninth Circuit held that a statute that required the City Treasurer to issue arcade game-licenses gave an arcade-game manufacturer a protected property interest in the licenses. *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 63 (9th Cir. 1994). The statute provided that the City Treasurer "shall make a determination" whether an arcade game qualifies as a game of skill. *Id.* If the game was a game of skill, the statute said that the game "shall be issued identification tags." *Id.* The court held that this mandatory (as opposed to discretionary) language was enough to give rise to a property interest. *Id.*; *cf. Kraft v. Jacka*, 872 F.2d 862, 867 (9th Cir. 1989) (holding that a Nevada statute granting Gaming Control Board "full and absolute power and authority" to deny license applications "for any cause deemed reasonable by the board" did not create a property interest), *abrogated on other grounds by Dennis v. Higgins*, 498 U.S. 439 (1991). Thus, it is possible that a requirement that OHA set rates approved by CMS as actuarially-sound could give rise to a protected-property interest.

But the issue OHA raises is not whether the requirement imposed on OHA to submit actuarially sound rates could, in the abstract, constitute a protected property interest. Instead, the issue is whether FamilyCare—even if such a property interest exists—has a claim to it. That is, the question is not whether FamilyCare's interest is constitutionally protected, but whether FamilyCare has the interest at all. Under OHA's theory, the actuarial soundness requirement is merely a condition for federal funding—not something FamilyCare has a right to, and not even a requirement that OHA must abide by independent of its ability to receive federal funds. According to OHA, FamilyCare's only interest is in a rate approved by CMS, which OHA did provide.

FamilyCare responds that whatever obligation OHA owes to CHS, it also owes to FamilyCare: since state law and the parties' contracts incorporate the federal actuarial soundness requirement, the relationship between OHA and CCO is effectively bilateral.

I find that FamilyCare does not have a protected property interest in receiving actuarially sound rates from OHA. State law may incorporate an actuarial soundness requirement, but it does that only to the extent that OHA must submit rates that CMS finds to be actuarially sound; it does not extend a right to actuarially sound rates to CCOs. FamilyCare's contracts with OHA also do not give FamilyCare a right to actuarially sound rates; as discussed below, the contracts do not incorporate the actuarial soundness requirement as between OHA and the CCOs. Thus, the facts here differ from *Wedges/Ledges*, where the statute told arcade-game manufacturers that they would get a license if their game was a game of skill. Here, the law requires rates that CMS finds to be actuarially-sound, but it does not tell CCOs like FamilyCare that they get those rates. *See Wedges/Ledges*, 24 F.3d at 63.

//

### b) Whether FamilyCare received the process due

Because I conclude FamilyCare sufficiently alleged a constitutionally-protected interest in goodwill, the next question is whether it received due process.

At a general level, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The analysis generally proceeds on a case-by-case basis: to consider what process is due, courts are to consider the private interest affected, the risk of erroneous deprivation and possible value of additional procedural safeguards, and the possible burden of the additional safeguards on the government's interest. *Id.* at 335. Normally, pre-deprivation process is required, but in some cases adequate post-deprivation remedies can satisfy due process. *See Parratt v. Taylor*, 451 U.S. 527, 540–41 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

Courts do not apply the *Mathews* three-part balancing test in a vacuum; instead, there is a large body of case law applying *Mathews* to many different circumstances. For example, courts have held that where, as here, a plaintiff's interest is derived from a contract with the government, state law contract claims may provide the only process due. *DeBoer v. Pennington*, 287 F.3d 748, 749–750 (9th Cir. 2002) (interpreting *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001)) [hereinafter *DeBoer II*]. That is true where the plaintiff's interest is "merely a contractual interest" such that the injury "may be fully remedied by a common law breach of contract claim." *Id.* at 750. But if the contract "give[s] rise to a greater interest than the contract itself," then more process is due—the breach of contract claim is insufficient. *Id.*; *see also Baird v. Board of Educ.*, 389 F.3d 685, 692 (7th Cir. 2004) ("The underlying concept seems to be that the remedy is available before the loss has become complete and irrevocable."). Such "greater

interests" include "present[] entitle[ment] either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Lujan*, 532 U.S. at 196.

Several cases help illustrate this rule. In *Lujan*, a California statute allowed state agencies to withhold payments to public works contractors if that contractor or its subcontractors failed to comply with certain provisions of the California Labor Code. 532 U.S. at 191. The plaintiff subcontractor alleged that the state had deprived it of property without due process when the state withheld payments after it determined that the subcontractor had engaged in unfair labor practices. *Id.* at 193. The Supreme Court assumed without deciding that the subcontractor had a constitutionally protected interest in "payment that it contends it is owed under a contract." *Id.* at 196. But since an available state law contract claim could restore that interest to the subcontractor, the state law contract claim was all the process due—even given the delay the subcontractor would experience in receiving those benefits by means of a lawsuit. *Id.* Still, the Court distinguished cases where the plaintiffs alleged a "present entitlement"—cases in which the government seized a house, suspended a racetrack trainer, and suspended a bank president. *Id.* In those cases, pre-deprivation process or more prompt post-deprivation procedures were required. *Id.*

Following *Lujan*, several circuits have held that a deprivation of property interest in employment, for example, is not remedied by a state law contract claim. *See, e.g.*, *Clukey v. Town of Camden*, 717 F.3d 52, 61 (1st Cir. 2013); *Baird*, 398 F.3d at 691–93. In *Baird*, a school superintendent sued the school board and its members alleging that its termination procedures violated due process. 389 F.3d 685. The Seventh Circuit determined that the superintendent had a present entitlement in his employment since he was one year into a three-year contract, and since the damages available in a breach of contract claim were not sufficient to remedy the loss

of a career in education. *Id.*; *see McCracken v. Lockwood Sch. Dist. No. 26*, 208 F. App'x 513, 516 (9th Cir. 2006) (unpublished) (citing *Baird* with approval).

In a different context, the Ninth Circuit has held that a deprivation of an entire contract was remedied by available state law contract claims. The plaintiff management company contracted with the defendant city to manage a city-owned cemetery. *DeBoer v. Pennington*, 206 F.3d 857, 860–62 (9th Cir. 2000), *cert. granted, judgment vacated sub nom. City of Bellingham v. DeBoer*, 532 U.S. 992 (2001) [hereinafter *DeBoer I*]. After some back-and-forth between attorneys, the city terminated the contract and required the manager to immediately leave the property, without any opportunity to correct the cause stated for the termination. *Id.* at 870–71. In *DeBoer I*, the Ninth Circuit held that termination deprived the manager of due process. *Id.* at 871. But the Supreme Court then remanded the case for further consideration in light of *Lujan*, which it had decided in the interim. *See DeBoer II*, 287 F.3d at 749. In *DeBoer II*, the Ninth Circuit reversed its early decision and held that "although the deprivation to the [manager], being the total termination of the contract, is greater than that suffered by the plaintiff in *Lujan*, the interest injured is still merely a contractual interest and the injury to the [manager] is no more than a contractual injury." *Id.* at 750.

Viewing the facts in the light most favorable to FamilyCare, the state law contract claim does not fully remedy FamilyCare's constitutionally-protected property interest in its goodwill. Like a career in education, goodwill is not something FamilyCare can reacquire through contract damages. The interest in this case is more than the right to contract payments asserted in *Lujan*: even if FamilyCare received all the contract damages it seeks, it cannot recover the thirty consecutive years of service and relationship to providers. *See* FamilyCare Complaint ¶¶ 85, 86;

16

*see also Lujan*, 532 U.S. at 196. Thus, viewing the facts in the light most favorable to FamilyCare, I find that FamilyCare's state law contract claim was not sufficient process.

### 2. Step two: whether the right was clearly established

At the second step of the qualified immunity analysis, OHA argues that even if it violated FamilyCare's due process rights, FamilyCare's rights were not clearly established.

Although the Supreme Court's case law "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S.Ct., at 551 (internal quotation marks omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). After all, the Supreme Court has " 'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.' " *City and Cty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775–76 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Some confusion may arise from the phrase "clearly established law." Qualified immunity does not ask whether the right to due process is clearly established; that, we know. Instead it asks whether the law clearly establishes that the specific actions Director Allen took violated due process. It must be so clear that "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).

In *Baird*, the Seventh Circuit held that the school board defendants were not entitled to qualified immunity since "numerous cases . . . have defined the contours of what process is due to a public employee who is to be terminated." 389 F.3d at 697. But the court also recognized that "[a] fine line distinguishes factual scenarios in which a judicial remedy for breach of

contract is adequate from those in which it is not." *Id.* at 691. "Present entitlement" the Seventh Circuit said, is a "mysterious element," a "somewhat obscure quality . . . [that] eludes precise definition." *Id.*

At oral argument, I asked FamilyCare to cite a case that defines the contours of whether a state law contract claim is an adequate remedy for an organization deprived of its goodwill when abruptly forced to terminate its contract with the public agency. Put simply, I asked FamilyCare to cite a case that would tell Director Allen that his conduct was unconstitutional. FamilyCare cited *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375 (9th Cir. 1989). There, a state agency immediately revoked a daycare's license on suspicion of child abuse. *Id.* at 1377. The state agency gave the daycare no predeprivation process; instead, it provided an administrative hearing on the license revocation eight days after the emergency revocation. *Id.* at 1378. The Ninth Circuit declined to grant summary judgment on the grounds of qualified immunity, holding that a disputed question of fact existed whether the daycare was entitled a pre-deprivation hearing. *Id.* at 1381. The Court noted that the "summary suspension on the ground of child abuse was likely to have severe and permanent consequences for [the daycare] regardless of the ultimate resolution . . . ." *Id.*

FamilyCare argues that *Chalkboard* is precisely on point because there, as here, the deprivation was severe. *Chalkboard* strongly suggests that where a business loses its ability to continue doing business—there, by revocation of its license, here, by forced shut down—a post-deprivation hearing is inadequate.

But *Chalkboard* is distinguishable in an important way. *Lujan* and later cases established that where the plaintiff's interest derives from a contract with the state (as in the context of a public employment contract or a contract to manage a city cemetery), the court must consider

whether the available state law contract claim can adequately remedy the deprivation. This is true even where the deprivation is complete, as in *DeBoer*. The *Lujan*, *Baird*, and *DeBoer* analysis applies here because FamilyCare's rights derive from the contract and state law contract claims are available to FamilyCare. Thus, courts would ask whether the remedy is adequate. *Chalkboard* did not consider whether the availability of a state law contract claim could remedy the daycare's deprivation, because the daycare had no contract with the state on which it could sue. *See Chalkboard*, 902 F.2d 1375. Thus, the *Chalkboard* analysis is incomplete in cases like this one where the plaintiff has an available state law contract claim that might remedy its deprivation.[3]

At step one I concluded the state law contract claim could not adequately remedy FamilyCare's lost goodwill. At step two, I find that no court, or any other source of law, has ever made that clear to someone in Director Allen's position. The line between mere contractual interest and "present entitlement" is blurry, and cases do not appear to have clearly established whether a loss of goodwill may be remedied by an available state law contract claim. Thus, in the light most favorable to FamilyCare, Director Allen's actions did not constitute a violation of "clearly established law." I therefore GRANT OHA's Motion to Dismiss FamilyCare's claims for damages against Director Allen in his individual capacity. Those claims are DISMISSED with prejudice.

//

---

[3] FamilyCare also cites *Lantz v. Crate*, 268 F. App'x 548 (9th Cir. 2008). There, plaintiffs alleged that members of a Nevada licensing board deprived plaintiffs of their business goodwill when defendants called credit bureaus to report that plaintiffs were violating state law. *Id.* at 550. In the unpublished memorandum, the court held that the board members were not entitled to qualified immunity since plaintiffs had an interest and "cannot be deprived of it without due process of law." *Id.* Without any analysis, the court held that the right to due process was "clearly established." *Id. Lantz* is distinguishable for the same reason that *Chalkboard* is: in *Lantz*, the plaintiffs were not afforded any process and did not have a state law contract claim to assert.

### C. *Whether FamilyCare's state APA claims are preempted (claims 4 and 11)*

In its fourth and eleventh claims for relief, FamilyCare asks me to review OHA's 2017

and 2018 rate-setting orders under the state APA. It alleges that the 2017 and 2018 orders are not

supported by substantial evidence or substantial reason; are based on an erroneous interpretation

of the law; and otherwise violate state law, administrative rules, federal law, and the constitution.

FamilyCare Complaint ¶¶ 115, 155. OHA moves to dismiss these claims on the grounds that

state APA review of the actuarial soundness of the orders is preempted by the Medicaid Act,

which gives CMS the sole authority to approve rates as actuarially sound.[4]

Federal law preempts state laws that are in actual conflict with federal law. *Emerald Steel*

*Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518, 526 (Or. 2010). An actual conflict

exists when state law "stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).

In cases involving purposes and objectives preemption, the analysis requires two steps: courts

must first ascertain the nature of the federal interest and then determine whether the state law in

question "frustrates the deliberate purpose of Congress." *Hillman v. Maretta*, 569 U.S. 490, 491,

494 (2013).

In these cases, courts apply a presumption against preemption; it must be "clear and

manifest." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S.

---

[4] In footnotes, the parties dispute whether OHA's contracts with FamilyCare constitute final orders for the purposes of the state APA. *See* ORS 183.480. A final order is an order expressed in writing but the definition "does not include any tentative or preliminary agency declaration or statement that . . . does not preclude further agency consideration of the subject matter. " ORS 183.310(6)(b). Before FamilyCare's case was removed, the state judge determined that OHA's 2017 and 2018 rates were final orders. OHA asks me to disregard that conclusion as legally erroneous. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 n.1 ("We reject Pareto's argument that the district court was required to follow the decisions of the state court prior to removal, even when those decisions were legally erroneous.") OHA says that the rates in the contract are not final orders because CMS still has to approve them. But I agree with FamilyCare and with the state judge: the fact that the federal government could deny the rates does not make OHA's order any less final.

470, 485 (1996)); *see New York v. F.E.R.C.*, 535 U.S. 1, 17–18 (2002). In the context of state and federal programs, "the case for federal pre-emption becomes a less persuasive one," *N.Y. State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973), since courts must be careful not to disturb "the congressionally designed interplay between state and federal regulation." *Nw. Central Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 518 (1989).

Here, the outcome in step two is determined by how I frame the interest in step one. FamilyCare argues that the structure of the Medicaid Act implies a broad interest in maintaining a federal-state cooperative program and a narrow interest in ensuring that state capitation rates are actuarially-sound. If those are the federal interests, then the availability of Oregon's state APA review supports those interests. First, the availability of APA review bolsters a state's control over how its program is administered: a state can choose whether and how to allow its rates to be judicially-reviewed under its APA. Second, APA review provides an additional opportunity to ensure that rates are actuarially sound.

By contrast, OHA contends that the nature of the federal interest is to preclude any private right of action to enforce the Medicaid statute. Of course, if that is the federal interest at stake, then the state APA judicial review would conflict with that interest, and the state APA claims would be preempted.

To determine the congressional intent, I look to the language, structure, and purpose of the federal law. *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008). The text of the statute provides little guidance as to which of the parties' asserted federal interests is correct. Section 1396b(m)(2)(A) says that under the relevant Medicaid program, a state will not receive federal funds unless:

> Services are provided . . . in accordance with a contract between the State and the entity under which prepaid payments to the entity are made on an actuarially sound basis and under which the Secretary must provide prior approval for contracts providing for expenditures in excess of $1,000,000 . . . .

42 U.S.C. § 1396b(m)(2)(A)(iii). The statute does not contain an express preemption provision, and it does not expressly indicate that the Secretary's approval is the only mechanism to review the actuarial soundness of the rates.

The structure of the state law can be read to support both parties' proffered federal interests. It could, as FamilyCare urges, imply an interest in a program cooperatively administered by federal and state governments, a program which would allow states to provide for APA review of their agencies' actuarial soundness determination. There are fewer uniformity concerns at stake than there might be in other federal-state programs, since the actuarial soundness determination occurs on a contract-by-contract basis. True, the state judicial review could conflict with the Secretary's actuarial soundness determination, but perhaps Congress preferred to give states the ability to make judicial review available to double-check their rates.

As OHA contends, the statute's structure can also be interpreted to preclude any private enforcement of actuarial soundness. For example, the Secretary is the only method of enforcement that the statute provides, and in other contexts, the Supreme Court has said that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 135 S.Ct. at 1385 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). The technical nature of the actuarial soundness requirement too might suggest that Congress intended for administrative enforcement alone. *See id.* (describing benefits of exclusively administrative enforcement in context of judgment-laden and complicated statutory requirements).

I do not find *Armstrong* particularly persuasive in this context. As discussed above, *Armstrong* only addressed whether the Supremacy Clause, the equitable power of federal courts,

and the Medicaid Act provided a right of action to the plaintiffs. Unlike the question at issue here—whether the Medicaid Act preempts an existing state law right of action—the federal-right-of-action questions before the *Armstrong* court did not implicate the federal-state balance of power issues inherent in the preemption analysis. So when *Armstrong* said that the withholding of funds was the "sole remedy Congress provided," 135 S.Ct. at 1385, it did not mean that Congress affirmatively precluded state-provided remedies. After all, the lack of federal remedies does not preclude state remedies for violations of federal law. *Cf. Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 817 (1986) (describing without questioning "the incorporation of a federal standard in a state-law private action, when Congress has intended that there not be a federal private action for violations of that federal standard"). As the presumption against preemption recognizes, a federal court's determination that a federal statute impliedly preempts a state remedy is an affront to state power warranting careful analysis, especially in the context of collaborative federal and state programs. *See Wyeth*, 555 U.S. at 565.

Ultimately, the text and structure of the Medicaid Act do not strongly suggest one interpretation of the federal interest over the other. Relying on the presumption against preemption, I hold that the Medicaid Act does not preempt state APA review of OHA's orders. I DENY OHA's Motion to Dismiss claims 4 and 11 on preemption grounds.

### D. Whether FamilyCare's contractual claims fail because FamilyCare lacks a right to actuarial sound rates (claims 2–3, 5–6, 8, 10)

FamilyCare brings claims for breach of the Settlement Agreement, the Dispute Resolution Agreement, and the parties' five-year Contract. OHA moves to dismiss some of these claims on the basis that FamilyCare has no right to actuarially-sound rates.

As an initial matter, I observe that OHA's basis for dismissal is slightly off the mark. FamilyCare's contract claims rise and fall with the terms of the contracts—not with whether FamilyCare has an independent right to actuarially sound rates. If a contract gives FamilyCare a right to actuarially-sound rates, then FamilyCare can state a claim for breach of that right. The inverse is also true: if the contract does not give FamilyCare a right to actuarially-sound rates, then FamilyCare does not have a viable claim for breach of contract. My rulings follow that logic.

## 1. Settlement Agreement claims (claims 2–3, 5–6)[5]

The Settlement Agreement, at issue in claims 2, 3, and 5, generally provides that OHA may not use future rates to penalize FamilyCare for the rates it received in 2016. FamilyCare Complaint Ex. 2. That is, under the Settlement Agreement OHA cannot "clawback" the increased rates it paid to FamilyCare in 2016 by lowering FamilyCare's future rates. The Settlement Agreement does not expressly obligate OHA to set actuarially sound rates.

Yet claims 2, 3, and 5 all refer to actuarially-sound rates. *See* FamilyCare Complaint ¶¶ 103, 111, 122, 128. To the extent FamilyCare's claims are premised on a right to actuarially-sound rates, I GRANT OHA's motion to dismiss these claims, since the Settlement Agreement provides no such right, and places no such obligation on OHA. I dismiss with prejudice claims 2, 3, and 5 to the extent they are based on a right to actuarially-sound rates. Because these claims are also premised on OHA's violation of the clawback prohibition, I otherwise DENY OHA's motion to dismiss these claims.

## 2. Dispute Resolution claim (claim 8)

---

[5] OHA argues that claim 6 suffers from the same flaw. But because I dismiss claim 6 in its entirety on different grounds below, I decline to address it here. *See infra* Part III § B.

Claim 8 alleges breach of the implied covenant of good faith and fair dealing in the Dispute Resolution Agreement. It alleges that OHA breached the Dispute Resolution Agreement by, among other things, using the process to gather information to use in its alleged Communications Plan against FamilyCare. This claim is not based on a right to actuarially sound rates. I DENY OHA's motion to dismiss this claim.

### 3. Five-year Contract claim (claim 10)

Claim 10 alleges breach of the five-year Contract's covenant of good faith and fair dealing. FamilyCare alleges that OHA violated its objectively reasonable contractual expectations, under the implied duty, that OHA would set rates that were "reasonable, unbiased, actuarially sound, and free of errors in underlying data and methodology." FamilyCare Complaint ¶ 149. OHA argues that the Contract did not give rise to a right to actuarially sound rates.

Indeed, no provision in the Contract explicitly gives FamilyCare a right to actuarially sound rates. *See* Wilson Decl. [82] Ex. 1 at 4; *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (permitting courts to consider "a writing referenced in a complaint but not explicitly incorporated [therein] if the complaint relies on the document and its authenticity is unquestioned"). The Contract does say that OHA will "actuarially set" the rates. *See* Wilson Decl. [82] Ex. 1 at 5. And it states that the full description of the actuarial methodology may be found in the actuarial report, available on OHA's website. *Id.* But the Contract explicitly specifies that the actuarial report "is not part of this Contract." *Id.*

Since there is no explicit provision, FamilyCare turns to its reasonable expectations. But again, nothing in the words of the Contract gives FamilyCare a reasonable expectation to actuarially sound rates. Instead, FamilyCare argues that federal and state law gives it a right to

expect those rates from its Contract with OHA. But I disagree; the existence of those laws is not sufficient to give FamilyCare a reasonable *contractual* expectation in actuarially sound rates. Thus, its breach of contract claim fails. I therefore GRANT OHA's Motion to Dismiss claim 10, and I dismiss claim 10 with prejudice.

## II. OHA's Motion to Dismiss Claims 6–9.

OHA moves to dismiss several of FamilyCare's state tort and contract claims for failure to state a claim. [77].

### A. Intentional interference with business relations (claim 9)

FamilyCare's ninth claim alleges that OHA intentionally interfered with its business relations when, in 2017, OHA developed a "communications plan" to smear FamilyCare in the press. FamilyCare Complaint ¶¶ 139–45. OHA's internal emails revealed a targeted plan to portray FamilyCare negatively in the press. FamilyCare Complaint ¶¶ 50–59. OHA made statements that portrayed FamilyCare negatively and caused one of FamilyCare's providers to enroll with a competitor. FamilyCare Complaint ¶ 144.

To state a claim for intentional interference with business relations, FamilyCare must establish: (1) FamilyCare had a business relationship; (2) OHA was not a party to that business relationship; (3) OHA intended to interfere with that business relationship; (4) OHA interfered through improper means or for an improper purpose; (5) the interference caused harm to the business relationship; and (6) the interference resulted in damages to the plaintiff. *See Nw. Nat. Gas Co. v. Chase Gardens, Inc.*, 982 P.2d 1117, 1123–24 (Or. 1999). The fourth element, improper interference, requires either improper means or improper purpose. To constitute improper means, the defendant's conduct must "violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law." *Id.* at 1124. A

defendant's purpose is improper if the purpose is "to inflict injury on the plaintiff as such." *Id.* (internal quotation marks omitted).

FamilyCare alleges that (1) it had business relationships with health care providers, Oregon Health Plan members, and its employees; (2) OHA was not a party to those relationships; (3) OHA's Communications Plan intended to interfere with FamilyCare's relationships; (4) OHA's interference was made through the improper means of misrepresentation and defamation, and with the improper purpose of injuring FamilyCare; (5) at least one provider enrolled with a competitor as a result of OHA's Communications Plan; and (6) the disruption in business relationships caused at least $7.5 million in damages to FamilyCare. *See* FamilyCare Complaint ¶¶ 139–145; *see also* FamilyCare Complaint ¶¶ 50–59.

First, OHA argues that FamilyCare's claim fails to establish the fourth element because it has failed to allege either improper means or improper purpose. OHA contends that creation of the communications plan alone did not violate any "objective, identifiable standard." Even though FamilyCare alleges that OHA violated defamation laws, OHA asserts that FamilyCare fails to identify which statements were false or defamatory. As OHA sees it, the statements it released were merely OHA's opinion about FamilyCare's motives in the rate setting process, and not defamatory falsehoods. *See, e.g.*, *Reesman v. Highfill*, 965 P.2d 1030, 1035 (Or. 1998) (expressions of opinion are not actionable defamation).

Contrary to OHA's assertion, FamilyCare does allege that OHA made a variety of statements and press releases that go beyond opinions. For example, FamilyCare alleges that OHA issued a report that erroneously portrayed FamilyCare as an "outlier." FamilyCare Complaint ¶ 58. And FamilyCare alleges that an April 2017 press release implied that

FamilyCare was not focused on the health of its members. *Id.* These allegations sufficiently allege defamation or misrepresentation as to constitute improper means.

Second, OHA argues also that its communications were not "for an improper purpose," since its purpose was to defend its rate-setting methodology from FamilyCare's public criticism, not to cause injury to FamilyCare. But in the light most favorable to FamilyCare, the underlying emails and the press releases do suggest an improper purpose (that is, a purpose beyond defending its rate-setting methodology), since those communications suggest that the plan was designed to hurt FamilyCare's credibility; promote FamilyCare's competitor; and portray FamilyCare as an entity solely concerned about profit margins. *See* FamilyCare Complaint ¶¶ 50–59. These objectives at least arguably go beyond any legitimate business purpose that OHA might have.

Third, OHA argues that FamilyCare has not adequately stated the fifth element of an intentional-interference claim since its allegation of causation and harm is too conclusory. OHA further points out that FamilyCare does not allege that it lost any members due to OHA's actions; instead, FamilyCare simply asserts that it lost a provider, even though FamilyCare receives funds based on the number of members enrolled, not based on its provider relationships.

At the motion to dismiss stage, I find the harm alleged—that a provider enrolled with a competitor—sufficiently states a harm to business relationship caused by OHA's actions. I DENY OHA's motion to dismiss claim 9 of FamilyCare's Complaint and DENY OHA's motion for a more definitive statement of this claim.

### B. Breach of covenant of good faith and fair dealing of the Settlement Agreement (claim 6)

FamilyCare's sixth claim is premised on a violation of the covenant of good faith and fair dealing contained in the Settlement Agreement.

The implied covenant of good faith cannot "vary the substantive terms of the bargain." *U.S. Nat. Bank of Or. v. Boge*, 814 P.2d 1082, 1092 (Or. 1991) (en banc). Courts do not imply good faith when parties agree to an express term on the issue. *Or. Univ. Sys. v. Or. Pub. Emps. Union*, 60 P.3d 567, 569–70 (Or. Ct. App. 2002).

OHA alleges that FamilyCare's claim either impermissibly duplicates the term of the agreement or impermissibly expands it: claim 6 either entirely overlaps with FamilyCare's claim for breach of the contract or creates a requirement beyond what the Settlement Agreement allows.

I agree that claim 6 duplicates claim 5, since the terms of the contract explicitly address the violations FamilyCare alleges. I thus, I GRANT OHA's motion to dismiss this claim and dismiss this claim with prejudice.

### C.  Breach of the Dispute Resolution Agreement (claim 7)

In its seventh claim for relief, FamilyCare alleges that OHA breached the Dispute Resolution Agreement because it did not act in good faith and cooperatively to reach a resolution. That agreement called for the parties "to conduct free and open discussion," to "work cooperatively," and to "participate in good faith in at least three substantive [Dispute Resolution] discussions." FamilyCare Complaint ¶ 41. FamilyCare alleges that OHA did not fulfill these obligations, and instead used the Dispute Resolution process to inform its smear campaign and later rate setting.

OHA alleges that it complied with the Dispute Resolution Agreement. It says, contrary to FamilyCare's allegations, that OHA was not required to produce trade secret information from

other CCOs; instead, the Dispute Resolution Agreement merely obliged OHA to work cooperatively toward an agreement for the protection and disclosure of that information. Furthermore, OHA notes that the Dispute Resolution Agreement contemplated the possibility that OHA may not be able to provide all the information FamilyCare sought. Moreover, OHA says, nothing in the Dispute Resolution Agreement prevented it from using information that FamilyCare gave it for other purposes.

I hold that FamilyCare has adequately alleged a claim for breach of the Dispute Resolution Agreement. At the motion to dismiss stage, I decline to find that FamilyCare's allegations incorrectly interpret the vague terms of the Dispute Resolution Agreement.

### D. Breach of good faith and fair dealing of the Dispute Resolution Agreement (claim 8)

FamilyCare's eighth claim is for breach of the Dispute Resolution Agreement's implied covenant of good faith and fair dealing. FamilyCare alleges that OHA breached the implied covenant by not engaging in good faith discussions, and by using the dispute resolution process to gather information to use in its smear campaign against FamilyCare. FamilyCare Complaint ¶ 136.

As discussed above, the covenant of good faith and fair dealing only applies where the parties have not agreed to an express term that governs the issue. *Or. Univ. Sys.*, 60 P.3d at 569. The implied covenant also does not provide a remedy for an unpleasantly motivated act that is nonetheless expressly permitted by the contract. *U.S. Nat. Bank of Or.*, 60 P.3d at 1092.

OHA points out that the Dispute Resolution Agreement defines good faith as good faith participation in at least three substantive discussions. Requiring any additional "good faith," OHA says, would therefore duplicate the existing good faith requirement or impermissibly

expand the given definition. As such, FamilyCare cannot read in a "good faith" requirement that OHA not use the information it gained in the dispute resolution process to smear FamilyCare in the press.

OHA cites no case law for the proposition that a good-faith requirement contained in a contract forecloses a claim for breach of the implied covenant, and I find none. I hold that FamilyCare's claim for breach of the implied covenant survives OHA's motion to dismiss because the Dispute Resolution Agreement could give rise to a reasonable expectation that OHA would not use the information in the way that it did. Thus, I DENY OHA's motion to dismiss this claim.

### III. FamilyCare's Motion to Dismiss OHA's Claim for Declaratory Judgment

OHA asserts one claim for relief. It requests a declaratory judgment that federal law preempts FamilyCare's state APA challenge to, and any other private enforcement of, the soundness of the 2018 rates. These questions do not turn on the facts of this case. Because I have determined that the Medicaid Act does not preempt state enforcement, I GRANT FamilyCare's Motion to Dismiss [27] OHA's claim.

### CONCLUSION

For the reasons stated, I GRANT OHA's motion to dismiss FamilyCare's claims for damages against Director Allen in his individual capacity. Those claims are dismissed with prejudice. I GRANT in part OHA's motion, and dismiss with prejudice, claims 2, 3, and 5 to the extent those claims are based on OHA's failure to provide actuarially sound rates. I GRANT OHA's claim to dismiss claim 10 and dismiss that claim with prejudice. I otherwise DENY OHA's Motion to Dismiss [24].

I GRANT FamilyCare's motion to dismiss OHA's claim [27]. OHA's Complaint is dismissed with prejudice.

I GRANT OHA's Motion to dismiss claim 6, and that claim is dismissed with prejudice. I otherwise DENY OHA's Motion to Dismiss [79].

Dated: June 1, 2018.

MICHAEL W. MOSMAN
Chief U.S. District Judge