

| | |
|---|---|
| **To:** | Oregon Health Authority |
| **From:** | Anne Karl, Manatt, Phelps & Phillips LLP |
| **Date:** | November 30, 2017 |
| **Subject:** | Assessment of Process for Setting 2018 Rates for Coordinated Care Organizations |

You have asked us to review the process used by the Oregon Health Authority (OHA or "the State"), working with its actuary, Optumas, to develop the calendar year 2018 capitation rates for Coordinated Care Organizations (CCOs) to evaluate whether the State's process complies with federal statutes, rules, guidance, and waiver terms (collectively, "federal requirements") and state law and regulations related to CCOs.[1]

Based on our review of the documents provided, conversations with OHA staff, and discussions with Optumas, we conclude that the State generally complied with the federal requirements, with the exception of a few minor areas. Specifically, the State did not consider medical loss ratio in the development of rates, and the Centers for Medicare & Medicaid Services (CMS) may require that the State resubmit the rates after taking into account historic and projected medical loss ratios. Additionally, the State did not comply with requirements in the special terms and conditions governing the State's waiver related to the development of the non-benefit component of the rate—namely, how it develops profit margins and how it accounts for flexible services. CMS may mandate minor adjustments to the rates to comply with these requirements, though it is unclear whether the requirements related to developing profit margins have taken effect. In addition to the two areas where CMS may conclude that the State did not fully comply with federal requirements related to developing rates, CMS may also request that the State submit additional documentation to describe in greater detail various adjustments and assumptions that Optumas made.

---

[1] We note that there were no state statutory or regulatory provisions directly affecting the CCO rate-setting process.

**Manatt, Phelps & Phillips, LLP**
7 Times Square, New York, New York 10036
Telephone: 212.790.4500

Exhibit 5
Page 1 of 4
FCI0372531

**manatt**
manatt | phelps | phillips

## I.    Background

### A.    The Oregon Health Plan and CCOs

Oregon, like many other states, contracts with organizations to arrange and pay for services to its Medicaid and Children's Health Insurance Program (CHIP) enrollees.[2] Oregon's program, referred to as the Oregon Health Plan, is authorized as a demonstration project under Section 1115 of the Social Security Act.[3]

Under Section 1115, the Secretary of Health and Human Services has broad latitude to waive federal requirements and authorize federal expenditures that would not otherwise be available to enable states to test innovative approaches to administering their Medicaid programs. All federal laws and rules apply to Section 1115 demonstrations, unless the Special Terms and Conditions (STCs) governing the 1115 demonstration expressly state otherwise. In addition to specifying which federal laws and rules do not apply to the demonstration, the STCs establish a framework for how the state may implement the program, impose obligations on the state related to spending and reporting, and describe the oversight process of the CMS.

The Oregon Health Plan is the State's longstanding 1115 demonstration. It was first authorized in 1994 and has been amended frequently as the program has evolved. In 2012, CMS approved an amendment to the Oregon Health Plan allowing the State to shift the delivery of care from managed care entities to CCOs—defined as community-based comprehensive managed care organizations (MCOs) that operate under a risk contract with the State.[4] The 2012 amendment also held the State accountable for achieving certain cost growth targets. The STCs were subsequently amended again in 2013, 2014, 2015, and 2016. In January 2017, the demonstration was extended through June 2022.

A brief overview of the waiver terms relevant to this analysis are below.

#### 1.    Global budgets

STC 36 provides that the State will employ "global budgets" to compensate CCOs. The STCs define a global budget as "representing the total cost of care for all services for which the CCOs

---

[2] Rate setting for Medicaid managed care is subject to more stringent requirements than rate setting for CHIP. See 42 C.F.R. § 457.1203. Oregon, however, incorporates CHIP in the Medicaid managed care rate-setting process. For example, a CCO will receive the same rate for a seven-year-old child, regardless of whether that child is covered through CHIP or Medicaid. In other words, Oregon voluntarily applies Medicaid's more stringent rate-setting requirements to its CHIP enrollees.

[3] Social Security Act § 1115(a).

[4] STC ¶ 24. All citations to the STCs refer to the most current set of STCs, which reflect the extension approved January 12, 2017 through June 30, 2022. The STCs are available at https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/or/or-health-plan2-ca.pdf.

Exhibit 5
Page 2 of 4
FCI0372532

# manatt
manatt | phelps | phillips

the CCOs' questions. It is also our understanding that Optumas did not publish a databook containing the underlying base data.

      o   *Conclusion:* ASOP 49 and Part 438 are aligned. To the extent that the process complies with the requirements of Part 438, it complies with ASOP 49. With respect to adherence to current practice around transparency in rate setting, we conclude that, though not required by law, rule, guidance, or STC, the State's process was generally consistent with the process described as current practice in the appendix to ASOP 49, with the exception of publishing a databook of all base data.

*     *     *

In sum, we have identified only minor process concerns with respect to the development of the 2018 rates, as well as minor concerns with respect to the documentation submitted. We anticipate the State will be able to address these relatively minor concerns during the ongoing rate approval process.[58]

---

[58] We understand that several questions were posed to the Legislature regarding the CCO rate-setting process. We include below those questions and our responses, noting the sections in this memorandum more fully addressing these issues.

1. *Question:* Do federal regulations (Medicaid Managed Care Rule - 42 CFR 438) require that capitation rates developed for managed care organizations (Oregon's coordinated care organizations) be actuarially sound for each rate cell for each CCO contract?

   *Answer:* Yes. Rates must be actuarially sound for each rate cell for each CCO, but Oregon is not required to account for all costs of each CCO when developing rates. Instead, Oregon must ensure that rates provide for all "reasonable, appropriate, and attainable" costs. If the State determines that particular costs are unreasonable or inappropriate, the rate need not be sufficient to cover such excess costs, so long as the level of costs that the rate covers is attainable. Oregon, like other states, has multiple tools for ensuring that rates are appropriate for each CCO and are not required to build rates specific for each CCO. A full discussion of this issue is found in Section II.A.3.

2. *Question:* Does anything in Oregon law allow the state to deviate from following the Medicaid Managed Care regulations?

   *Answer:* No. Oregon statute and rules related to CCOs do not impose any requirements on rate-setting. Additionally, state law does not supersede federal Medicaid requirements, and all federal Medicaid requirements apply unless CMS grants a waiver of such requirements.

3. *Question:* Does Oregon's 1115 waiver with the federal government allow the state to deviate from following the Medicaid Managed Care regulations?

   *Answer:* Yes, but only to allow the State to shorten the time period for disenrollment without cause and to contract with only one plan for dental services and one plan for mental health services. The State must comply with all federal rules related to rate setting. See Section I.A.3 for a more detailed discussion.

22

Exhibit 5
Page 3 of 4

FCI0372552

# manatt
manatt | phelps | phillips

Please let us know if you have any questions concerning the above.

---

4. *Question:* Broadly speaking, if the Oregon Health Authority submitted capitation rates to CMS that were not actuarially sound for each CCO contract, would the agency be in violation of federal or Oregon laws or regulations?

   *Answer:* Yes. If the rates were not actuarially sound for each CCO contract, the State would be out of compliance with federal rules. In such a case, CMS would likely require that the State re-develop and re-submit rates. See Section II.A.3 for a broader discussion of what it means for rates to be actuarially sound for each CCO.

5. *Question:* Does OHA's policy decision to truncate primary care reimbursements for some CCOs in developing the capitation rates violate the global budget provisions in state law or any federal regulations, include 42 CFR 438.6(c)?

   *Answer:* No. The State may make adjustments to costs in base data to reflect "reasonable, appropriate, and attainable costs" of participating in the managed care program. The State is not required to develop cost-based rates for each CCO. See Sections II.A.3 and II.A.4 for further discussions.

6. *Question:* By withholding base data used to develop CCO capitation rates from public view based on a trade secret designation, is the state violating the transparency standards in federal regulations or Oregon statutes?

   *Answer:* No. The federal rules and STCs require transparency with respect to the modification or phase out of the waiver itself—not the development of the rates. There are no provisions in federal rules or STCs that require the State to publish its base data. Similarly, there are no state statutes or rules requiring that the State make publicly available the data used in developing rates.

23

Exhibit 5
Page 4 of 4
FCI0372553