IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICK ALLEN, in his official )
capacity as director of Oregon )
Health Authority, an agency of )
the State of Oregon,           )
                               )
          Plaintiff,           )   Case No. 3:18-cv-00212-MO
                               )
     v.                        )
                               )
FAMILYCARE, INC., an Oregon    )
non-profit corporation,        )
                               )
          Defendant.           )
-------------------------------)
FAMILYCARE, INC., an Oregon    )
non-profit corporation,        )
                               )
          Plaintiff,           )   Case No. 6:18-cv-00296-MO
                               )
     v.                        )
                               )
OREGON HEALTH AUTHORITY, an    )
agency of the State of Oregon, )
and PATRICK ALLEN, both        )   April 6, 2018
individually and in his        )
official capacity as director  )
of the Oregon Health Authority,)
                               )
          Defendants.          )   Portland, Oregon
_____)


**Oral Argument**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES

FOR OREGON HEALTH
AUTHORITY and PATRICK
ALLEN:                    Mr. David Markowitz
                          Mr. Matthew A. Levin
                          Ms. Brittany Simpson
                          Markowitz Herbold PC
                          1211 S.W. Fifth Avenue, Suite 3000
                          Portland, OR 97204


FOR FAMILYCARE, INC.:     Mr. Stephen F. English
                          Mr. Douglas R. Pahl
                          Ms. Alletta Brenner
                          Mr. Thomas R. Johnson
                          Perkins Coie, LLP
                          1120 N.W. Couch Street, 10th Floor
                          Portland, OR 97209


COURT REPORTER:           Bonita J. Shumway, CSR, RMR, CRR
                          United States District Courthouse
                          1000 S.W. Third Ave., Room 301
                          Portland, OR  97204
                          (503) 326-8188

(P R O C E E D I N G S)

(April 6, 2018)

THE CLERK:  Your Honor, this is the time set for oral argument in Case No. 3:18-cv-212-MO, Allen v. FamilyCare, Inc., and Case 6:18-296-MO, FamilyCare, Inc. v. Oregon Health Authority, et al.

Counsel, can you please state your name for the record.

MR. ENGLISH:  Stephen English on behalf of plaintiff FamilyCare, Your Honor.  I'm accompanied today by Alletta Brenner to my left and Douglas Pahl to my right.

MR. MARKOWITZ:  Your Honor, David Markowitz, special assistant attorney general for all of the State-related parties.  With me is Special Assistant Attorney General Matt Levin, and also from our office, Brittany Simpson.

THE COURT:  Thank you all for being here today.

I want to cover one matter not related to discovery, just so I can be prepared for in a couple of weeks we're holding a hearing on cross motions to dismiss.  And those are cross motions that were briefed here in federal court and are ready for oral argument.

There were also cross motions -- well, there were motions to dismiss filed in state court that were fully briefed, and then now the issue is what are we going to do about them.

I accept the argument that the pleading standards in state and federal court are different enough that a motion to dismiss filed in state court, relying at least in part on that different pleading standard, would be a difficult one -- probably an unworkable motion to fully just simply adopt here in federal court, but I don't mean by that to suggest that I'm going to simply never hear those arguments.  I think what it means is I have to create some space for those same arguments filed in state court and not a part of the federally filed cross motions to dismiss to, if the parties choose to do so, to be heard in federal court.  I don't know how long that would take or whether you think you could simply rework them quickly so that they're ready in two weeks, or whether it's a completely different timetable.

MR. LEVIN:  Your Honor, what would Your Honor's schedule be for seeing a reworking of the briefs?

THE COURT:  My schedule for what?

MR. LEVIN:  What would Your Honor's preferred schedule be to get the reworked briefs in the two weeks that we have left, if we're going to go that route?

THE COURT:  Well, what I don't want, if it can be avoided, are two hearings on motions to dismiss.  So it would be a challenge for all of us to fold the state -- I'll call them state and federal cross motions to -- or motions to dismiss.  It would be a challenge to fold the state motions

into the currently scheduled hearing, but on the other hand, I like challenges.

MR. LEVIN:  Thank you, Your Honor.

THE COURT:  So I don't want to put the parties to an impossible task.  If it can be done, let's do it.  If not, then we'll have to set the whole hearing over to accommodate everything.

MR. LEVIN:  I think it can be done, Your Honor.

THE COURT:  Meaning that you could refile the underlying state motions by when?

MR. LEVIN:  I think we can do it in a week.

THE COURT:  And how many motions on how many theories?

MR. LEVIN:  I think it was three different -- three or four different Rule 21 motions.

And different theories -- the reason why I think we can do it in a week, Your Honor, is because I think that the difference between Rule 12 and Rule 21, I don't think that's going to make a great difference in the briefing.  I realize they'll have to be reworked, but I think we can do that relatively in a streamlined way.

THE COURT:  All right.  And that's -- so tell me what you filed below.  I shouldn't say "below."  I don't mean that at all.

MR. LEVIN:  In Salem?

THE COURT:  Tell me what you filed with my colleagues in state court who are busier and smarter than I am.

MR. LEVIN:  Your Honor, I think we have three pending Rule 21 motions from state court that were argued and briefed.

THE COURT:  Well, I mean specifically what did you file?  Responses?  Motions?  What did you file?

MR. LEVIN:  The State filed three Rule 21 motions, Your Honor.

THE COURT:  And were there replies?

MR. LEVIN:  Yes.  There were responses and replies, and they were argued before the third amended complaint came up back in January, I believe.

THE COURT:  All right.  And does the -- is the intent on reworking them to take into account a subsequent amendment to the complaint?

MR. LEVIN:  No, I don't think -- I don't think we need to do that.  There was a Rule 21 motion that had to do with I think the intentional interference claim that was subtly changed in the third amended complaint, if I'm remembering correctly, but I think we can still deal with them relatively easily.

THE COURT:  Well, I probably didn't phrase that question correctly.

MR. LEVIN:  Sorry.

THE COURT:  In my view -- I'm only going to listen to

motions that seek to dismiss the operative complaint.  So what I really mean is do the changes in the amended complaint that we now have alter the situation much on the briefing?

MR. LEVIN:  No, Your Honor.  We're still -- we would still apply the same logic to the third amended complaint that is the operative complaint.

THE COURT:  Okay.  Thank you.

MR. LEVIN:  Thank you.

MR. ENGLISH:  Your Honor, with your permission, Thomas Johnson, my partner who is here can deal with that.

THE COURT:  Mr. Johnson, please come forward.

MR. JOHNSON:  So that's fine with us.  I just would like to know, Your Honor, how -- so if we get their brief next Friday, they're saying a week from now, then that's a week until the hearing.  How long -- how long would you like to have our brief in chambers before the hearing?

THE COURT:  Well, this only works if everyone gets it all in in a week, on the understanding that what's being reworked is any references to Rule 21 that have to be altered to Rule 12, but that the underlying arguments are identical to what you face below.

And so I assume that's what you meant to do?

MR. LEVIN:  Yes, Your Honor, that's what I meant.

THE COURT:  And if that's what's happening, then what that allows me to do is I'm going to assume that what I get in

a week is so close to what I now could have in front of me -- I don't, but I could have in front of me, that I could start in right away and not see something very different from that in a week.  Is that your understanding?

MR. LEVIN:  Yes, Your Honor.

THE COURT:  So it would be the understanding that you wouldn't face anything new.  So you could do that also in a week.  And if you don't think that's going to work, then the whole thing is not going to work.

MR. JOHNSON:  No, that's fine, Your Honor.  I was just wondering if you would like it on Wednesday or, you know, Tuesday, which would give us less than a week, which is fine. If we have a week, that's fine, but I think we could probably get you a brief -- my understanding is, as you've just stated, that it is not going to be a complete rework.  So I think we could get you something by Wednesday, if that's fine with you.

THE COURT:  Well, let's try it by Wednesday, everybody by the end of the day Wednesday.

I'm not the one that is panicking.  Actually, Ms. Daniel is the one over here who is panicking.  But she's from Michigan, and I've learned that Michigan grads can do just about anything.

MR. JOHNSON:  That's my understanding also.

(Laughter.)

MR. LEVIN:  (Indiscernible.)

THE COURT:  Oh, my goodness.

So if you embark on this task and it becomes unworkable, then you'll let me know, and if I embark on this task starting Wednesday and it won't work, then I'll let you know and we'll set over everything.

It's still possible, I guess, that I'd see this and think I just can't get ready and still hold the scheduled hearing and just hold another one.  I don't like that.  But let's try to make this work.  We'll all make our best efforts, and then we'll take it from there.

MR. JOHNSON:  Just so I understand it, so a week from now, they can still get their brief --

THE COURT:  No, everybody on Wednesday, end of the day.

MR. JOHNSON:  Okay.  Thank you.

THE COURT:  For everything.  Motions, responses, replies all come in end of the day Wednesday, altered for federal court, which I think is, as I understand what you're telling me, cosmetic, not substantial.

MR. ENGLISH:  Just so I'm clear, Your Honor, you're talking nomenclature, not content.

THE COURT:  Exactly.

MR. ENGLISH:  Great.  Thank you.

MR. LEVIN:  And just so I'm clear, Your Honor, which Wednesday are we talking about?

THE COURT:  Less than a week from today.

MR. LEVIN:  Less than a week.  That's what I thought.

Thank you, Your Honor.

MR. JOHNSON:  Thank you, Your Honor.

THE COURT:  All right.  Thank you all for being willing to give it the old college try.  I won't say which college.

All right.  We have several motions and issues to discuss today.  I'll say that one of the interesting things -- themes that kind of recurs as I go through my analysis of these discovery motions is that in the absence of counterclaims or defenses, it does limit sort of the circumference of what's potentially relevant just to the claims in the complaint.  And that may have an impact that would be different if we were examining this -- the same discovery issues later.  But here we are.

So I'll start with OHA's motions first.  And I'm going to walk through my views.  Sometimes I know the answer and sometimes I have questions, and I'll try to be clear about which ones I'm not ruling on and which ones I am.

So OHA moves to compel what I'll call lobbying and public relations services documents and testimony from FamilyCare.

FamilyCare originally asserted both attorney-client and work product privilege objections to that request, and now

in its briefing only relies on work product.  That's how I'm reading the briefing, that there's no assertion of attorney-client privilege.

And in my mind, it basically shakes out this way:  that what FamilyCare attorneys prepared but perhaps incidentally shared with public relations people is probably protected under work product, and what public relations people prepared and shared with FamilyCare attorneys is almost certainly not protected.

But I can't tell what OHA wants, both or just one, but the wrong one or what.  So I guess I'd have to assume from your original request that you would want both, right?

MR. LEVIN:  Yes, Your Honor, that's true.

THE COURT:  All right.  So I find -- well, is there anything further you wish to say about how I shook that out between the directions of preparation and delivery?

MR. LEVIN:  The only thing I would add, Your Honor, is that when it comes to the documents that were prepared by the FamilyCare lawyers, that it should be narrowly tailored to be only those portions of documents authored by lawyers that reflect the strategy about the conduct of the litigation as opposed to ideas about the effect of the litigation.

THE COURT:  I agree with that distinction that's found both in the briefing and cases, and I think that's fairly established, that it has to be about how to go ahead with the

litigation and not how the litigation will be perceived by the public.

So with that qualification in mind, I grant in part and deny in part the motion.  I grant it as to materials prepared by lobbying and public relations services subsequently sent to FamilyCare attorneys or others.  I grant it to them, limited as we discussed, and I deny it as to materials prepared by FamilyCare attorneys and shared with public relations folks on work product.

The second request by OHA is to compel actuarial documents from Pricewaterhouse.

So there are attorney-client and work product issues here, but I guess my first question is going to be relevance. I would say that nothing that OHA has submitted so far really persuades me that what is being sought, in light of the procedural posture of this case, no defenses and no counterclaims is relevant.

MR. LEVIN:  Thank you, Your Honor.

The way that I would address the relevance issue here, we can look just to FamilyCare's complaint, and FamilyCare's complaint is replete with references about errors in the rate-making process, about errors in the data, about decisions that were made by actuaries, about the rate-setting process itself methodologies.

So relevant documents are going to be documents that

relate to those allegations, make them more likely to be true or false.

THE COURT: Well, to be clear, the complaint doesn't talk about errors in ratemaking, it talks about OHA errors in ratemaking. It's not a general discussion that there can be errors in actuarial calculations. It says OHA made those errors.

MR. LEVIN: Your Honor, I think the complaint is ambiguous enough that unless FamilyCare wants to say it now, that it intends to say that part of the work that the actuary hired by OHA -- Optumus -- did contained errors. I think that that is part of what they are going to want to assert in this case. And if I'm wrong, that does change the --

THE COURT: I'm sure that's right, but I'm not sure it advances your argument.

MR. LEVIN: So when you cut out the work that PricewaterhouseCoopers -- PwC -- did in connection with being a testifying expert, what you're left with is work that it did related to FamilyCare's participation in that rate-setting process that it's complaining about now. So it was doing its own calculations. It was going through the same actuarial process that Optumus was going through on behalf of OHA. It was reporting those results to the public, and it was using them as part of its participation in the process itself.

THE COURT: So some day FamilyCare wants to tell a

jury that your ratemaking process was flawed, and you want to tell a jury it wasn't flawed.  How are you going to use a Pricewaterhouse document to prove your ratemaking wasn't flawed?

MR. LEVIN:  Well, for example, one of the ways that FamilyCare is going to want to tell the jury that the rate-setting process was flawed --

THE COURT:  Not the rate-setting process, your rate-setting process.

MR. LEVIN:  OHA's rate-setting process was flawed is that we told you so.  We told you during this process that there were things that OHA should consider.  And as a part of that rate-making process, where all the CCOs are involved, it appears that FamilyCare was relying on actuarial work done by its actuary, PwC.

So as part of its explanation to the jury -- "This was a problem all along, we discussed it with you" -- to the extent it had PwC doing that actuarial work so it could participate in this process that it now complains about, that work is relevant.

THE COURT:  You're going to stand in front of a jury and hold up a Pricewaterhouse document and say, "Our ratemaking wasn't flawed and this document shows it wasn't flawed" how?

MR. LEVIN:  Maybe I am.  I don't know what the documents say.  Maybe I'm going to --

THE COURT:  You have to have a guess what it might say to make it potentially relevant.

So what might you be able to do with such a document?

MR. LEVIN:  I think, for example, there are Pricewaterhouse documents that will say the ratemaking process was not flawed, that we agree with some of the conclusions that OHA and its actuary made, and some of the assumptions that they used.

THE COURT:  All right.  Thank you.

MR. LEVIN:  Thank you, Your Honor.

THE COURT:  Go ahead.

MS. BRENNER:  Your Honor, good morning.

THE COURT:  Good morning.

MS. BRENNER:  So on this issue with PwC, there's really a couple points I'd like to emphasize.

The first one, which was glossed over a bit here, is the fact that PwC has only had two engagements for FamilyCare. In both situations, PwC was engaged by counsel for litigation purposes, and that is the only scope of work that we're talking about.

THE COURT:  Is that your attorney-client argument? Is that your attorney-client privilege argument?

MS. BRENNER:  Well, I suppose it's related to both, both in terms of what is the scope of relevance here as to what PwC was doing, both in the lawsuit a couple years ago, in which

PwC -- they're referring to references that were made when OHA and FamilyCare were engaged in settlement discussions and putting out some public information about the different offers that had been made by either side.

THE COURT:  I don't see the connection.  PwC documents might not be relevant because they were only engaged twice?

MS. BRENNER:  So going to that, the scope of what they were engaged for, I guess, is the point of what I'm getting at.  In 2016, PwC was engaged to do some analysis to aid FamilyCare in its litigation, and that work was related to whether settlement offers being made on either side were reasonable and whether those rates were something that CMS would accept.  And that's what's reflected in the public statements that they refer to.

THE COURT:  All right.

MS. BRENNER:  That issue is not relevant to this lawsuit over the rate setting.

THE COURT:  So what if a PwC document analyzes OHA's ratemaking process and says, here's the only flaws we can find, but generally we think it's pretty good?

MS. BRENNER:  So with respect to that issue, that is something that PwC is now analyzing as FamilyCare's expert in this case.  And what we would say to that is that's certainly relevant, but the issue is that they are FamilyCare's retained

expert.  There's going to be expert discovery, where that information about what they rely on in their ultimate conclusions is going to be made available in the ordinary course.

And so what it appears is happening here is that OHA is trying to use this additional subpoena directed to PwC to circumvent that process and get a broad range of other information.

THE COURT:  Thank you.

Let me just state my preference -- and this isn't by way of criticism at all.  It's a common argument and frequently a useful one.

But there are going to be enough discovery disputes in this case that if I categorize the things I care about in answering a discovery dispute, what you think the other party's motives are is the lowest item on the list, since you don't know and I'll never know.  I almost never try to figure that out when I'm figuring out what's going on here.

So there's a potential relevance for these documents, and my view on attorney-client privilege, in particular -- and it's probably the same factors and the same outcome on work product -- is that Pricewaterhouse is, in fact, an expert retained by FamilyCare for litigation or pending litigation, and taking into account the long and sort of recurring history of litigation in this case, which I think draws a broader

circle of litigation and pending litigation or potential litigation than might normally be the case, and I also don't find waiver either through the settlement discussions or even the press release, since I don't think what was disclosed was either work product or privileged.  So that would lead to denial of the motion on that basis but not relevance.

Do you wish to be heard any further on either being an expert or waiver?

MR. LEVIN:  The only thing that I would ask, Your Honor, is that part of the reason why we're hamstrung a little bit is because the privilege log, which really lists 19 documents from Pricewaterhouse, doesn't allow me to make an argument before you that says now we know that some of this work that they did isn't related to an expert engagement.

And so what I would ask is that in denying the motion, that FamilyCare be ordered to produce a more detailed privilege log that includes more of the Pricewaterhouse documents.

THE COURT:  All right.  Thank you.

I'm not going to do that at this instance, although I understand the problem.  Of course, being hamstrung by privilege and work product doctrine is the nature of privilege and work product doctrine.

The third request from OHA is a motion for FamilyCare's campaign contributions, correspondence with

candidates.

My only concern here is relevance. So here we go again. Your argument on relevance?

MS. SIMPSON: Good morning, Your Honor.

It's relevant because FamilyCare spent eight pages of its complaint focused on OHA's supposed communications plan that was never enacted, and the idea of the communications plan was that OHA was going to communicate with the public in the lobbying.

FamilyCare we know has spent similar funds to communicate with the legislature, and one of the ways that FamilyCare influenced -- tried to influence the ratemaking process is through lobbying. So their campaign contributions are relevant, particularly in light of the fact that they're arguing that OHA tried to use a communications plan to influence the rate-setting process and their animus towards FamilyCare.

THE COURT: Sounds like that would make a great counterclaim.

MS. SIMPSON: It will, Your Honor.

The other reason that it's relevant is that FamilyCare claims that OHA is the reason it's out of business. Its animus, its inappropriate rates, it's the reason that it went out of business.

But what we're going to show to the jury, Your Honor,

is that it's FamilyCare's reckless spending is the reason it's out of business, and its reckless spending seemed to increase as FamilyCare's complaints about its rates got louder.  And while campaign contributions is one piece of the reckless spending, it's part of the entire picture that we need to paint to the jury, that its reckless spending is the reason that it's out of business.

THE COURT:  Thank you.

I deny the motion as not relevant, grounded in the current procedural posture of the case.

There's an OHA motion for FamilyCare's database of providers.  I also deny that on relevance grounds.

There's an OHA motion for documents relating to documents disclosed in an August 2017 contact with an Oregonian reporter.  OHA's argument here is that the -- that in its disclosure to the reporter, FamilyCare waived any privilege, not just to those documents but everything related to the same subject matter.

That's a valid argument if the initial disclosure was privileged, but it falls apart if it wasn't.  And I view the initial disclosure as not privileged, so I deny that motion.

I'm going to turn to FamilyCare's motions.

Its first is to take 25 depositions beyond the ten initial depositions.  And its argument, if I could sum it up, is that this is a highly technical case and a big case.

And the answer is that that's not enough to yet show a need.  A case being technical doesn't mean you need more depositions.  And although I'm probably the only person in America that thinks this, a case being big doesn't mean that you necessarily need more depositions.  You'll have to show me what you need that you can't get and that hasn't been available through standard practice.

So I deny that, but of course with leave to renew at a later time.

Yes, sir?

MR. ENGLISH:  Your Honor, may I be briefly heard on that?

THE COURT:  Yes.

MR. ENGLISH:  Thank you, Your Honor.

Part of the problem we've got, we do have three sets of depositions.  Number one would be the OHA employees or former employees; number two would be Optumus employees; and number three would be the authors or a 30(b)(6) of two reports, the Menatt (ph) report, the Lewis report, and then at least the individual entity, Health Share, that competes with us directly in this region.

If you just take Optumus and those three, excluding for a minute OHA, then we have eight depositions right there.

Now, assuming that we go now to OHA, we have both current and former employees in positions -- for example, Lynne

Saxton, and then Mr. Allen.  We've got a former CFO and a current CFO, and I believe we have a former communications director and a current communications director.

So what I was doing, Your Honor, was thinking of it in terms of ten times seven is 70 hours, and what I'm really looking for is probably an additional 50 percent in hours, because I think some of these depositions may be short.  But to have to, as it were, waste a deposition on somebody whose knowledge is important but limited to a particular period of time puts us at a disadvantage.

So either we do a 30(b)(6), which encompasses ultimately a myriad of witnesses -- I think ten is an unrealistic number in this particular situation.  I understand your ruling, but I wanted to at least explain why what I'm talking about actually wasn't made out of whole cloth but actually was based on some very real expectations of what we need to do in discovery.

And I'm assuming the Court is going to allow us to come back as necessary.

THE COURT:  Yes.  That's fully my expectation.

MR. ENGLISH:  Thank you, Your Honor.

THE COURT:  I don't mean to suggest that there's a rock solid line at ten.  It's really a statement that for me to go above ten, particularly to go immediately to 25, 35, I need more information than you've given me.

MR. ENGLISH:  And for what it's worth, I sat down last night and I think I got it down to 19.

THE COURT:  Grand total?

MR. ENGLISH:  Pardon?

THE COURT:  Grand total?  Ten plus nine, not 19 additional?

MR. ENGLISH:  Correct, ten plus nine.

So I do think that that number is a realistic number, but again, I will come back to the Court after we've determined --

THE COURT:  We could try to work that out now.  We're not at 35 anymore.  We're at 19.

Your response?

MR. LEVIN:  Your Honor, with respect to Mr. English's comment about hours, I have a strong belief that we can work that out.

THE COURT:  All right.

MR. LEVIN:  The argument that he has made about 19, I don't know who those 19 are.  I still think it's premature for the reasons Your Honor said.  I think it's something that we can probably discuss maybe after we've taken a deposition, but at this point, there's just too much uncertainty to respond to that, other than to say we can be flexible on our end.

THE COURT:  Probably the right answer is to move forward with ten and see where it goes, but I like to only

handle questions once, not twice, if I can.  So if you mean 19, and you're willing to stick with 19, then we'll go with 19.

MR. ENGLISH:  I will, Your Honor.

THE COURT:  All right.

MR. ENGLISH:  Thank you.

THE COURT:  I'll allow you 19.

You can work out the hours amongst yourselves.  And that means that 20 is going to be a tough sled for you.  If you want one more, then it's --

MR. ENGLISH:  I'll have to make a compelling argument to a tough judge.

MR. LEVIN:  And, Your Honor, that would be 19 per side?

THE COURT:  Sure.  What's good for one complex big case is good for another one.  I'm sorry, highly technical also.

MR. LEVIN:  Also, yes.

THE COURT:  All right.  The next motion by FamilyCare is to set a date certain for the production of this third-party actuary data from OHA.  And, of course, that's the subject of a state court order.

This comes up, as you might imagine, fairly often in removal cases.  It's actually kind of an interesting *Erie* question in a way.  But my own resolution of this is that although I can't adopt state court orders that are grounded in

state law that -- state procedural law that's inconsistent with federal procedural law, there is a thumb on the scale in favor of state court orders in removal cases where it's not flatly inconsistent.

And here I don't see any real problem with me essentially adopting the state court order. And that order would require further production here.

I'm interested, since what the order doesn't do -- or at least if it did, it's now out of date -- is come up with a reasonable period for -- reasonable time period for this production.

MR. LEVIN: And, Your Honor, I hope I can address that.

THE COURT: Go ahead.

MR. LEVIN: Thank you.

As of yesterday, we understand that Optumus, which is a third party at issue in this motion, has produced all of the documents relating to that earlier order that Your Honor was speaking of.

THE COURT: All right.

MR. LEVIN: So I believe the production is done.

And the reason I say "I believe," which is not normally what I would like to say, is because OHA didn't have custody or control of those documents. And so we are relying on what Optumus is telling us and what Optumus is doing. But

that is what Optumus told us yesterday.

The only other issue at this point, Your Honor, is the documents that Optumus is working on in response to the latest request for production of documents, but for that request, our response we provided timely on March 29th.  So we're not talking about at this point a motion to compel.

THE COURT:  Right.  I'm not concerning myself with anything that's not in a motion in front of me.

So as to that motion, I understand the position you're in.  It is an unusual position.  It's one that I fully accept, that all you can do is report on to your opponents and to the Court what Optumus tells you.

But today in court, you're telling me that Optumus has told you that it has fully completed production under that prior state court order?

MR. LEVIN:  That's what Optumus told me.

THE COURT:  All right.

MR. LEVIN:  With one caveat:  that there was some further discussion about what that production would look like, because it generated document -- many hundreds of thousands of documents that everyone agreed were irrelevant.  So there was some after-the-order agreement that happened, and I understand from Optumus that the production that it made yesterday was in compliance with that agreement.

THE COURT:  All right.  I accept that and I deny as

moot the motion to set a date certain or, for that matter, compel further production.

FamilyCare moves for OHA to produce --

MR. ENGLISH:  Your Honor.

THE COURT:  Yes.

MR. ENGLISH:  May we -- may Ms. Brenner address that issue in terms of the mootness?

THE COURT:  Yes.

MR. ENGLISH:  Thank you.

THE COURT:  Go ahead.

MS. BRENNER:  So, Your Honor, there's two things that FamilyCare is concerned about with respect to that prior court order.

The first issue is that the real important part of Judge Armstrong's ruling on that motion to compel was to confirm that it is OHA that had custody and control, legal custody and control over those documents, and that it's OHA's responsibility to ensure that they are produced to FamilyCare.

And so even to the extent that some of the documents that had not been produced at the time that order was granted have now been produced, FamilyCare is concerned -- would like to just get confirmation from this Court that that continues to be the case and that FamilyCare can rely on OHA to ensure that with respect to additional documents that need to be produced, that they are produced.

Second of all --

THE COURT:  Let's take them one at a time.

So my answer to that is that you can rely on it precisely to the extent I accepted the representation from your opponent here today in that manner.

MS. BRENNER:  Okay.

THE COURT:  Next?

MS. BRENNER:  The second issue FamilyCare would like to bring to the Court's attention is that although there has been some additional production of documents that were long overdue by Optumus, it is not clear at all to us that that -- that that production is complete, and in fact what Mr. Levin alluded to about additional documents that had not been produced, it appears as though some of those still have not been produced, because the most recent productions we received from them yesterday still appeared to be missing documents that we were expecting to see.

And so we would not concede the point that production has been made as to all of those documents that are now three months overdue.

THE COURT:  Thank you.

And then you know how that plays out.  This happens a lot in discovery motions, where there's a motion to compel, and one side says, okay, we've now produced everything.  That's an officer of the court making that representation in court.  And

so that ends the motion but it doesn't end your ability to take a harder look and file another motion if you identify things you think are missing.

So speaking of underlying state court orders, FamilyCare moves for OHA to produce data on other CCOs and, in fact, requests me to take a fresh look at the whole process that court entered into.

The underlying state court order set up I think a potentially workable balancing of the discovery and privacy interests at play here, and as an initial matter, I accept that the privacy interests asserted by the CCOs justify the protections they initially sought.

And to some degree FamilyCare in its briefing today has set forth a series of arguments that are really trying to persuade me that that initial balancing was wrong and that the interests of the third parties aren't as important as the underlying state court order seems to reflect.

And I'm not persuaded that as an initial matter that balancing was wrong or exaggerated the privacy interests of the CCOs.

But pragmatically speaking, I said it was a potentially workable solution. But pragmatically speaking, if, as I believe has happened here, the CCOs have overstated or over-designated the documents, then it becomes potentially unworkable.

So I am, as my response to this motion, requiring the CCOs to reexamine their "attorney eyes only" and "confidential" designations, and I'll say that if they're not significantly reduced, I will conclude that this method is not working, and at least consider scrapping it, and then we'll just have to see where we get after they take another look at that.

Since I don't have a lot of information from them, I'm not today going to impose a particular deadline on that. I'll just say that I want it to happen quickly.

FamilyCare moves to compel documents related to the communication plan of OHA.

Yes?

MR. LINDAUER: Your Honor --

THE COURT: I don't often get hecklers from the crowd, or when I do, it's usually that there's a marshal present and they don't say very much before they're gone.

But go ahead, speak freely.

MR. LINDENAUER: Eric Lindenauer, representing PacificSource Community Solutions, one of the intervenors. And I was hoping -- I don't want to take up too much of the Court's time, but could we get some guidance as to the belief that we may have over-designated? On behalf of my client, we tried to submit a declaration that point by point supported our designations. So in order to comply with the Court's suggestion that we need to take another look, I'd be very

interested in knowing where the Court believed there were over-designations.

THE COURT:  I'm not sure I can help you as much as you'd like.  It's a belief grounded in my experience in big cases with AEO designations in patent and other difficult cases, where your numbers are just simply far in excess of what's typically the case, so far in excess that I'm persuaded that it just can't be.

So take another look, and if you come back to me and say it just can't be done, then we'll have to litigate that more completely in a hearing where you're designated to be here and make your argument.

All right.  We're now on the motion to compel documents related to the communication plan.  And it's very similar to the August 2017 doppelganger of this ruling earlier. It's a motion that has strength if OHA disclosed in a public records request something that was privileged.

It's complicated because initially OHA did, in fact, assert the attorney-client privilege as to these document -- as to this disclosure, and now OHA wants to eat that statement and say that what it produced actually was not privileged, and therefore the rest follows:  if it wasn't privileged, then there's no waiver if you don't get, you know, everything related to the topic that was disclosed to the -- I believe this one was to the Tribune instead of the Oregonian.

And I agree with that.  I agree that what was initially disclosed was not privileged, and therefore, similar to the Oregonian ruling, I don't find waiver and I deny the motion.

The last motion is for a protective order to prevent OHA from deposing Mr. English.  And there is -- there are two potential tests.  One is the typical good cause prejudice test, and the other is the more rigorous Eighth Circuit test.

I've taken a look at both of those tests with regard to the potential deposition of Mr. English, and I find that OHA satisfies neither of them for his deposition, and so I grant the protective order and deny any request to depose Mr. English in this case.

And I believe that covers the motions in front of me.

Anything further from OHA?

MR. LEVIN:  Your Honor, I just have one question about the last ruling.  May I assume that that is a ruling without prejudice?  Because we might actually discover that there are some pieces of information that are only within Mr. English's purview.

THE COURT:  Yes.  You'd have to be quite a ways down the road to know that, so, you know, I don't expect to see this again in a month, because you'd have to have exhausted other avenues, reasonable avenues, to get to the point where you think you could make that case.

MR. LEVIN:  Thank you, Your Honor.

THE COURT:  Anything further from FamilyCare?

MS. BRENNER:  Your Honor, with respect to your ruling on the AEO issue, something that FamilyCare is concerned about is the timeline on this, given how far we are into this process and how little time we have to complete discovery in this case. Could you provide some guidance as to the timeline in which that review should be completed?  And also, if possible, we would like to put a date on the calendar where we could come back and follow up or seek additional guidance that we need.

THE COURT:  Any thoughts or do you wish to confer with the heckler in the crowd?

MR. LINDENAUER:  There's so many of the us, Your Honor, that I hesitate to speak for everyone with respect to timelines.

THE COURT:  What I think we should do is just set a date out where you feel that you reasonably could know a lot more than you know today about how it's going so it just doesn't fall through the cracks.

So in, say, three weeks would you know a lot more than you know today about how that's going?

MR. LINDENAUER:  I would think so, Your Honor.

The problem that we're having, Your Honor, is we don't designate the documents.  We don't even know what's been designated and have no way of knowing.  So to the extent that

there have been designations beyond what the CCOs have specifically requested, we don't control that process. All we know is what we have individually called out and said this is what we care about. Then OHA takes that, and using that information or its documents -- I understand that OHA has already, in looking at its designations, removed a number of them. But that's what we know. We can only address this generically in terms of our own documents and not with respect to the specific designations, unless FamilyCare follows the procedure in the existing protective order and identifies to us what of our information they don't believe we can protect or should protect.

THE COURT: We'll set a status conference for three weeks out in which I expect substantial progress to have been made.

Ms. Scheele, can you give us a suggested date.

THE CLERK: Thursday, April 26th, at 10:30.

THE COURT: 10:30. I'm perfectly willing to do this by telephone. Does that work for everyone?

MR. LEVIN: Yes, Your Honor.

MR. ENGLISH: Yes, Your Honor.

THE COURT: We'll take up this issue on Thursday, the 26th, by telephone, at 10:30.

Thank you all. We'll be in recess.

MR. LEVIN: Thank you, Your Honor.

                    THE CLERK:   Court is in recess.

                              (Proceedings concluded.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                    June 11, 2018
_____    _____
BONITA J. SHUMWAY, CSR, RMR, CRR       DATE
Official Court Reporter